# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,

    v.

LUIS G. CABRERA, JR.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

Cr. I.D. No. 9904019326

Final submission: June 10, 2015
Decision: June 17, 2015

***Upon Defendant's Motion for Postconviction Relief***
**GRANTED in part; DENIED in part.**

## OPINION

Thomas C. Grimm, Esquire,  Rodger D. Smith II, Esquire, Ethan H. Townsend, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Defendant.

Elizabeth R. McFarlan, Esquire, and Maria T. Knoll, Esquire, Department of Justice, Wilmington, Delaware, Attorneys for the State of Delaware.

**Rocanelli, J.**

# I. INTRODUCTION AND PROCEDURAL HISTORY

The bodies of Brandon Saunders and Vaughn Rowe were discovered in a wooded area of Rockford Park in Wilmington, Delaware on January 21, 1996 ("Rockford Park Murders"). Nearly four years later, on December 6, 1999, Luis Cabrera ("Cabrera") and Luis Reyes ("Reyes") were indicted as co-defendants for the Rockford Park Murders.[1] The State sought the death penalty for both Cabrera and Reyes. Counsel was appointed for both defendants.[2] The trials of Cabrera and Reyes were severed by the Trial Court.[3]

## A. Rockford Park Trial and Direct Appeal

Cabrera was tried first ("Rockford Park Trial"), with jury selection starting on January 9, 2001. Jury deliberations began on February 8, 2001, and the jury returned a verdict on February 11, 2001, finding Cabrera guilty of two counts of First Degree Murder, two counts of Conspiracy in the First Degree, and other offenses.

The penalty phase began on February 13, 2001 and ended on February 15, 2001. The jury recommended that Cabrera receive the death sentence for each of

---

[1] At the time they were indicted for the murders of Rowe and Saunders, Cabrera and Reyes were serving sentences imposed for the January 1995 murder of Funador Otero. Cabrera was serving a life sentence for Murder First Degree. Reyes was serving a 13-year sentence for Murder Second Degree.

[2] "Cabrera Trial Counsel" was John P. Deckers, Esquire and Anthony A. Figliola, Esquire. Cabrera Trial Counsel also represented Cabrera on direct appeal.

[3] The "Trial Court" references the presiding judge to whom this case was assigned until May 2013.

the Rockford Park Murders by a vote of 11–1. The Court postponed Cabrera's sentencing until the completion of Reyes' trial for the Rockford Park Murders. Reyes was convicted on October 19, 2001, and, on October 26, 2001, the jury recommended that Reyes receive the death sentence for each of the Rockford Park Murders by a vote of 9–3. By decision and Order dated March 14, 2002, the Trial Court sentenced both Cabrera and Reyes to death.[4]

An automatic, direct appeal was filed with the Delaware Supreme Court.[5] While the direct appeal was pending, on July 9, 2002, Cabrera filed a motion for a new trial based on claims of discovery of new evidence. The direct appeal was stayed pending the Trial Court's consideration of the motion for a new trial. On December 19, 2002, the Trial Court held a hearing regarding the admissibility of newly discovered evidence in support of Cabrera's motion for a new trial. On April 3, 2003, the Trial Court ruled that the newly discovered evidence was inadmissible. Consequently, the Trial Court denied Cabrera's motion for a new trial.[6] The Supreme Court lifted the stay on Cabrera's direct appeal and, on

---

[4] *State v. Cabrera* (*Cabrera Sentencing*), 2002 WL 484641, at *5–8 (Del. Super. Mar. 14, 2002).
[5] *See* 11 *Del. C.* § 4209(g) ("Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the recommendation on and imposition of that penalty shall be reviewed on the record by the Delaware Supreme Court."); Cabrera's direct appeal to the Delaware Supreme Court was filed on March 21, 2002.
[6] *State v. Cabrera* (*Cabrera Motion for New Trial*), 2003 WL 25763727 (Del. Super. Apr. 3, 2003).

2

January 27, 2004, affirmed Cabrera's convictions and death sentences.[7] On

February 24, 2004, the Trial Court set Cabrera's execution date for June 4, 2004.

## B. Appointment of Rule 61 Counsel and Postconviction Motions

By letter dated March 8, 2004, Cabrera notified the Trial Court that Cabrera

intended to pursue postconviction relief and requested appointment of counsel.

The Trial Court appointed counsel to represent Cabrera in the postconviction

proceedings ("Rule 61 Counsel").[8] On April 20, 2004, Cabrera's Rule 61 Counsel

filed a motion to stay execution. The Trial Court granted the motion to stay

execution on April 27, 2004. Cabrera's Rule 61 motion filed in November 2004—

amended in 2007, in 2012, and as briefed in 2014–2015—is now pending before

this Court for decision.[9]

---

[7] *Cabrera v. State* (*Cabrera Direct Appeal*), 840 A.2d 1256, 1259 (Del. 2004).

[8] Various lawyers have been appointed as Rule 61 Counsel since 2004: first, Christopher D. Tease, Esquire and Michael Heyden, Esquire; second, Christopher D. Tease, Esquire and Kevin J. O'Connell, Esquire; third, Christopher D. Tease, Esquire and Jim Haley, Esquire; fourth, Christopher D. Tease, Esquire, Thomas C. Grimm, Esquire and Rodger D. Smith II, Esquire. In the meantime, Mr. Tease is not practicing law. *See In re Tease*, 105 A.3d 990 (Del. Nov. 20, 2014) (TABLE).

[9] On November 30, 2004, Cabrera filed his first motion for postconviction relief. On March 19, 2007, Cabrera filed an amended motion for postconviction relief. On January 18, 2007, Cabrera filed a motion for leave to contact jurors from the Rockford Park Trial, which the Trial Court denied on August 7, 2008. *State v. Cabrera* (*Cabrera Motion for Leave to Interview Jurors*), 984 A.2d 149 (Del. Super. 2008). On January 22, 2008, Cabrera filed a motion for leave to conduct discovery in furtherance of the motion postconviction relief, which the Trial Court denied on August 14, 2008. *State v. Cabrera* (*Cabrera Motion for Leave to Conduct Discovery*), 2008 WL 3853998 (Del. Super. Aug. 14, 2008). On October 4, 2012, Cabrera filed a second amended motion for postconviction relief. The Trial Court held evidentiary hearings in October 2012 and on April 1, 2013. *See* Super. Ct. Crim. R. 61(h)(1). The presiding judge retired from the Superior Court in May 2013. The matter was reassigned by then-President Judge Vaughn in September 2013. Cabrera filed a post-evidentiary hearing brief on April 14, 2014. The State filed a response on July 15, 2014. Cabrera replied on October 3, 2014. Transcripts were

3

## II. CONSIDERATION OF PROCEDURAL BARS

Superior Court Criminal Rule 61 governs Cabrera's motion for postconviction relief.[10]  Postconviction relief is a "collateral remedy which provides an avenue for upsetting judgments that otherwise have become final."[11] To ensure the finality of criminal convictions, the Court must consider the procedural requirements for relief set out under Rule 61(i) before addressing the merits of the motion.[12]

Rule 61(i)(1) bars a motion for postconviction relief if it is filed more than three years from the final judgment; this bar is not applicable as Cabrera's first postconviction motion was filed in a timely manner.[13]  Rule 61(i)(2) bars successive postconviction motions;[14] this bar is not applicable as Cabrera has not filed successive postconviction motions.  Rule 61(i)(3) bars relief if the motion includes claims not asserted in prior proceedings leading to the final judgment; this bar will be addressed in the discussion of the claims to which it applies.  Rule 61(i)(4) bars relief if the motion includes grounds for relief formerly adjudicated in

---

obtained on February 7, 2015, and this Court heard oral argument on May 27, 2015.  The parties submitted supplemental argument and the record was closed on June 10, 2015.

[10] Super. Ct. Crim. Rule 61 has since been amended.  All references to Rule 61 refer to the version of the Rule in place in 2004, when Cabrera filed his motion for postconviction relief.

[11] *Flamer v. State*, 585 A.2d 736, 745 (Del. 1990).

[12] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

[13] Rule 61(i)(1) (barring a motion for postconviction relief unless filed within three years after the judgment of conviction is final); *Bailey v. State*, 588 A.2d 1121, 1127 (Del. 1991).

[14] Super. Ct. Crim. R. 61(i)(2) (barring successive postconviction motions if the motion it includes grounds for relief not asserted in a prior postconviction proceeding).

any proceeding leading to the judgment of conviction, in an appeal, or in a postconviction proceeding; this bar will be addressed in the discussion of the claims to which it applies.

The procedural bars to postconviction relief under Rule 61(i)(3)[15] can be overcome if the motion asserts a colorable claim that there has been a "miscarriage of justice" as the result of a constitutional violation that undermined the fundamental fairness of the proceedings.[16] Likewise, the procedural bar under Rule 61(i)(4)[17] can be overcome if consideration of the claim on its merits is warranted in the "interest of justice." If the postconviction motion is procedurally barred and neither exception applies, the Court should dispose of the motion because postconviction relief is not "a substitute for direct appeal."[18]

Cabrera's postconviction motion asserts multiple claims of constitutional violations, including claims of ineffective assistance of counsel. The Delaware Supreme Court has declined to hear claims of ineffective assistance of counsel on direct appeal and, therefore, the first opportunity for Cabrera to assert such claims is in an application for postconviction relief.[19]

---

[15] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(1) and (2), but those bars are not relevant here.

[16] Super. Ct. Crim. R. 61(i)(5). *See also Younger*, 580 A.2d at 555; *State v. Wilson*, 2005 WL 3006781, at *1 n. 6 (Del. Super. Nov. 8, 2005).

[17] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(2), but that bar is not relevant here.

[18] *Flamer*, 585 A.2d at 745.

[19] *Id.* at 753; *State v. Gattis*, 1995 WL 790961, at *3 (Del. Super. Dec. 28, 1995).

5

## III. <u>THE STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Cabrera claims that Cabrera Trial Counsel provided ineffective legal assistance in violation of Cabrera's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and Article 1, § 7 of the Delaware Constitution. The standard used to evaluate claims of ineffective counsel is the two-prong test articulated by the United States Supreme Court in *Strickland v. Washington*,[20] as adopted in Delaware.[21] The movant must show that (1) trial counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different.[22] Failure to prove either prong will render the claim insufficient.[23] Moreover, the Court shall dismiss entirely conclusory allegations of ineffective counsel.[24] The movant must provide concrete allegations of prejudice, including specifying the nature of the prejudice and the adverse affects actually suffered.[25]

With respect to the first prong—the performance prong—the movant must overcome the strong presumption that counsel's conduct was professionally

---

[20] 466 U.S. 668 (1984).

[21] *See Albury v. State*, 551 A.2d 53 (Del. 1988).

[22] *Strickland*, 466 U.S. at 687.

[23] *Id.* at 688; *Dawson v. State*, 673 A.2d 1186, 1196 (Del. 1996).

[24] *Younger*, 580 A.2d at 555; *Jordan v. State*, 1994 WL 466142, at *1 (Del. Aug. 25, 1994).

[25] *Strickland*, 466 U.S. at 692; *Dawson*, 673 A.2d at 1196.

6

reasonable.[26] The Court's scrutiny of counsel's performance must be highly deferential and "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time."[27] To satisfy the performance prong, Cabrera must assert specific allegations to establish Cabrera Trial Counsel acted unreasonably as viewed against "prevailing professional norms."[28]

With respect to the second prong—the prejudice prong—the question for the Court is whether there is a reasonable probability that, absent the errors, the Trial Court "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[29] In considering the prejudice prong, this Court must "consider *all* the relevant evidence that the [Trial Court] would have had before [him] if [counsel] had pursued a different path."[30] To satisfy the prejudice prong, Cabrera must establish the existence of a substantial likelihood, not a mere conceivable likelihood, of a different result of the proceedings absent Cabrera Trial Counsel's errors.[31]

---

[26] *Strickland*, 466 U.S. at 687–88.

[27] *Id.* at 689.

[28] *Id.* at 688; *Wright v. State* (*Wright 1996*), 671 A.2d 1353, 1356 (Del. 1996) ("Mere allegations of ineffectiveness will not suffice.").

[29] *Strickland*, 466 U.S. at 695.

[30] *Taylor v. State* (*Taylor 2011*), 32 A.3d 374, 382 (Del. 2011) (alteration in original) (internal quotation omitted).

[31] *Strickland*, 466 U.S. at 693; *Ploof v. State*, 75 A.3d 840, 852 (Del. 2013).

## IV. CABRERA TRIAL COUNSEL WAS INEFFECTIVE
## WITH RESPECT TO MITIGATION

This Court will consider the merits of procedurally sufficient constitutional claims as well as any colorable claim of ineffective assistance of counsel. Cabrera's claim of ineffective assistance of counsel with respect to the presentation made during the penalty phase regarding mitigation will be addressed on the merits.

**A. Cabrera Claims that Mitigation Investigation was Inadequate**

Specifically, with respect to mitigation, Cabrera contends Cabrera Trial Counsel was ineffective for focusing on the guilt phase, rather than the penalty phase; by improperly relying on the mitigation investigation conducted previously for the Otero Trial; and for ignoring "red flags" uncovered in connection with the Otero Trial and the Rockford Park Trial. The State's argument does not focus on the sufficiency of Cabrera Trial Counsel's mitigation investigation. Instead, the State disagrees that a more extensive mitigation investigation would have revealed a history of childhood abuse and neglect. The State classifies Cabrera's upbringing as "common-place" and argues that childhood issues such as sibling rivalry and the lifestyle of Cabrera's father are "everyday occurrences in one's childhood" rather than "'red flags' of abuse missed by [Cabrera Trial Counsel]."[32]

---

[32] State's Resp. 57–58 (July 15, 2014).

Cabrera argues that Cabrera Trial Counsel was ineffective with respect to its mitigation investigation and its preparation of a defense for the penalty phase of the Rockford Park Trial. According to Cabrera, Cabrera Trial Counsel failed to locate and interview at least a dozen witnesses who could have provided background information on Cabrera to develop a mitigation strategy. Cabrera argues that Cabrera Trial Counsel failed to obtain his school, military, and hospital records; failed to retain a mitigation specialist; and never prepared a comprehensive social history for Cabrera's penalty phase defense. Cabrera contends that a proper investigation would have uncovered a history of child abuse and neglect; there is a reasonably probability that the jury would not have voted 11–1 to recommend the death penalty if a proper mitigation case had been presented; and, accordingly, Cabrera would not have been sentenced to death by the Trial Court.

## B. The Standard for Mitigation in a Capital Case

The United States Supreme Court has recognized that defense counsel in a capital case is "obligat[ed] to conduct a thorough investigation of the defendant's background."[33] In 1989, the American Bar Association promulgated guidelines for defense attorneys in capital cases ("ABA Guidelines").[34] With respect to

---

[33] *Williams v. Taylor*, 529 U.S. 362, 396 (2000).
[34] *See Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989) (hereinafter *ABA Guidelines*).

conducting a mitigation investigation, Section 11.4.1 of the ABA Guidelines provides:

> A. Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously.
>
> B. The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt.
>
> C. The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.

According to the introductory paragraph of the ABA Guidelines, the guidelines serve to "enumerate the minimal resources and practices necessary to provide effective assistance of counsel." The ABA Guidelines delineate the prevailing professional norms for defense counsel in capital cases.[35] Failure to follow the guidelines is not tantamount to ineffective assistance of counsel *per se*,[36] but the ABA Guidelines do set a standard for evaluation of Cabrera Trial Counsel's conduct regarding its mitigation investigation.[37]

---

[35] *Strickland*, 466 U.S. at 688.

[36] *State v. Taylor*, 2010 WL 3511272, at *17 (Del. Super. Aug. 6, 2010) ("Neither the United States Supreme Court nor the Delaware Supreme Court has held that failure to meet the ABA Guidelines in legally tantamount to ineffective assistance of counsel.").

[37] *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in the [ABA Guidelines] and the like . . . are guides to determining what is reasonable.").

10

The ABA Guidelines comment that defense counsel's "duty to investigate it not negated by the expressed desires of a client. Nor may [defense] counsel sit idly by, thinking that the investigation would be futile. The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each."[38]

## C. Cabrera Counsel Was Well Aware that a Mitigation Expert Should Have Been Retained and, Indeed, Planned to Hire an Expert But Did Not Do So

Cabrera Trial Counsel testified at the postconviction hearing that they did not hire a mitigation specialist for the Rockford Park Trial because that was not the prevailing professional norm in 2001.[39] Instead, Cabrera Trial Counsel maintains that Mr. Carl Kent ("Defense Investigator") conducted an investigation into Cabrera's background and that this investigation was sufficient.[40]

Cabrera Trial Counsel Deckers represented Cabrera at the Rockford Park Trial while contemporaneously representing Jack Outten, another client in an unrelated criminal case, in a postconviction proceeding. With respect to the Outten matter, Deckers argued that Figliolia (coincidentally Decker's co-counsel in the Rockford Park Trial) was ineffective as counsel for Outten because Figliola failed to conduct a proper mitigation investigation in accordance with the ABA Guidelines. In support of the postconviction case in *Outten*, Deckers submitted an expert report, stating in relevant part:

---

[38] *ABA Guidelines*, *supra* note 34, § 11.4.1, cmt. (internal quotation omitted).
[39] Ev. Hr'g Tr. 10/23/2012 at 83:5–23.
[40] *Id.* at 73:22–74:1.

11

> [P]reparing a thorough mitigation case is the single most important thing an attorney can do in a death-penalty case, short of convincing the prosecutor not to seek death in the first instance. An inadequate investigation is almost a certain prescription for death.[41]

The Court cannot reconcile Cabrera Trial Counsel's postconviction hearing testimony that, despite Cabrera Trial Counsel's direct involvement in the *Outten* case, they were unaware of the 1989 ABA Guidelines and the importance of mitigation experts.[42]

Moreover, the mitigation specialist used for the postconviction proceedings in the *Outten* case is the same mitigation specialist Cabrera Trial Counsel noted should be hired for Cabrera's case, but was not retained. Indeed, Cabrera Trial Counsel's files include at least three separate notes hand-written by Cabrera Trial Counsel indicating that a mitigation specialist should be hired for Cabrera.[43] In fact, one of the notes specifically identifies the name of a mitigation specialist, which was the same mitigation specialist Deckers was contemporaneously relying upon in the *Outten* case.[44] Accordingly, Cabrera Trial Counsel were aware that

---

[41] Expert Report Re: *Outten* Mitigation (July 19, 2000), Cabrera Ex. 77 at 0698.

[42] Ev. Hr'g Tr. 10/23/2012 at 83:3–84:1–11.

[43] *See* Cabrera To Do List, Cabrera Ex. 23 at 0095 (Deckers wrote: "meet with Tony to discuss . . . mit[igation] specialist."); Notes (Apr. 7, 2000), Cabrera Ex. 24 at 0097 (Deckers wrote: "we need to hire . . . mitigation specialist."); Notes (Oct. 24, 2000), Cabrera Ex. 27 at 0107 ("Mitigation Specialist – Lori James-Monroe.").

[44] Notes (Oct. 24, 2000), Cabrera Ex. 27 at 0107 ("Mitigation Specialist – Lori James-Monroe.").

prevailing professional norms required a mitigation specialist *and* they had specifically considered retaining such an expert.[45]

**D. Cabrera Trial Counsel Concedes Focus on Guilt Phase to the Exclusion of Penalty Phase**

Cabrera Trial Counsel denies the allegations of ineffective assistance of counsel, stating, "[Cabrera Trial] Counsel believes that the presentation of the mitigation evidence was adequate and *consistent with Cabrera's instructions for the penalty hearing* . . . . [Cabrera Trial] Counsel is unaware of any important mitigation evidence that was not presented to the jury or any evidence that would have likely altered the jury's 11–1 vote."[46] Cabrera Trial Counsel's Rockford Park Trial strategy focused on the guilt phase rather than the penalty phase of the Rockford Park Trial. At the postconviction hearing, Cabrera Trial Counsel testified that they focused on the guilt phase because "once the jury found out that [Cabrera] was already serving life for [the] murder [of Otero] . . . it would be tough to give [Cabrera] anything other than the death penalty."[47] Neither attorney prepared for the penalty phase because Cabrera Trial Counsel agreed to rely on the mitigation investigation conducted for the Otero Trial instead.

---

[45] *See Ploof*, 75 A.3d at 853–55 (discussing the court's concern that trial counsel had suspected there were issues with the defendant).
[46] Cabrera Trial Counsel Aff. ¶ 20(a), (b) (June 17, 2005) (emphasis added).
[47] Ev. Hr'g Tr. 10/23/2012 at 77:17–20.

Cabrera Trial Counsel focused on the guilt phase and reused the Otero Trial mitigation investigation for the penalty phase. This was a strategic decision and the Court must determine if Cabrera Trial Counsel's decision to reuse the Otero Trial mitigation investigation at the Rockford Park Trial was objectively reasonable.[48] The Court will give deference to "strategic decisions made after thorough investigation of law and facts relevant to plausible options," as such decisions are "virtually unchallengeable."[49] In other words, the question for the Court is not whether Cabrera Trial Counsel *should have* presented mitigation evidence at the Rockford Park Trial. Rather, the question is whether reasonable judgment supported the extent of Cabrera Trial Counsel's mitigation investigation (i.e., the use and *de minimis* supplementation of the Otero Trial investigation) and if that investigation supported the subsequent decision not to introduce additional mitigating evidence at the Rockford Park Trial.[50]

## E. Reliance on the Otero Mitigation Investigation was Not Professionally Reasonable

The Otero Trial mitigation investigation primarily consisted of a psychological evaluation of Cabrera by Dr. Edward Dougherty. On May 30, 1998, Dr. Dougherty completed a report on Cabrera ("Otero Report"), the purpose of

---

[48] *See Wiggins v. Smith*, 539 U.S. 510, 521–29 (2003) (discussing the scope of deference owed to a decision to focus on the guilt phase, rather than the penalty phase).

[49] *Outten v. Kearney*, 464 F.3d 401, 417 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690).

[50] *See id.* at 416–19; *Wiggins*, 539 U.S. at 521–23.

14

which was to complete a comprehensive psychological evaluation of Cabrera and render an opinion as to Cabrera's complete mental health. In addition to completing four psychological tests, Dr. Dougherty reviewed Otero Trial discovery materials and a background history of Cabrera completed by an investigator.[51]

The Otero Report stated that Cabrera "tends to portray himself as being relatively free of common shortcomings to which most individual[s] [sic] will admit, and he appears somewhat reluctant to admit minor faults."[52] The Otero Report characterized Cabrera as lacking anxiety, problematic behavior, or any "serious indicators of a major psychopathological condition."[53] Dr. Dougherty concluded the Otero Report with the following, "it is clear that Mr. Cabrera could function in a highly structured situation such as a state prison. There was no indication that [Cabrera] is [an] [sic] actively violent person who would be a danger to himself or other people in a prison environment."[54]

At the Rockford Park Trial, Cabrera Trial Counsel relied on the Otero Trial investigation because "it was successful in the Otero Trial."[55] However, Cabrera Trial Counsel failed to address the unanswered questions posed by the Otero Trial

---

[51] The investigator hired by Cabrera's defense lawyers for the Otero Trial was Defense Investigator retained by Cabrera Trial Counsel for the Rockford Park Trial.

[52] Psychological Evaluation by Dr. Dougherty (May 30, 1998), Cabrera Ex. 14 at 0054 (hereinafter *Dougherty*).

[53] *Id.* at 0054.

[54] *Id.* at 0056.

[55] With respect to the Otero murder, the jury voted 7–5 in favor of a death sentence. The Otero Trial Court rejected the jury's death penalty recommendation and sentenced Cabrera to life in prison without the possibility of parole.

15

investigation. For instance, Cabrera Trial Counsel did not address lingering concerns from Dr. Dougherty's Otero Report regarding certain statements Cabrera made: "I keep reliving something horrible that happened to me . . . . I've been troubled by memories of a bad experience for a long time . . . . I have had some horrible experiences that make me feel guilty."[56] At the Otero Trial, Dr. Dougherty opined that Cabrera has "a problem and [Cabrera] needs to address that problem[,]" but Dr. Dougherty did not identify the problem.[57]

**F. Dr. Dougherty was Unavailable to Testify as a Witness; Dr. Jackson's Last-Minute Independent Review was Cursory and Insufficient; and Dr. Jackson was Not a Compelling Witness**

Not only was Dr. Dougherty's Otero Report inadequate, but it was not even presented to the jury by Dr. Dougherty himself because he was unavailable for the Rockford Park Trial. Even though Cabrera Trial Counsel had anticipated that Dr. Dougherty would present the Otero Report as mitigating evidence during the penalty phase of the Rockford Park Trial, Cabrera Trial Counsel did not contact Dr. Dougherty until five days before the Rockford Park Trial began.[58] Due to the short notice, Dr. Dougherty was not available to testify and recommended that his partner, Dr. Ryno Jackson, serve as a substitute witness.

---

[56] *Dougherty*, *supra* note 52, at 0055.
[57] Otero Tr. 6/3/1998 at 49:16–50:1–19, 50:21–52:1–23, State's App. at B-46.
[58] Letter to Dr. Edward J. Dougherty (Jan. 5, 2001), Cabrera Ex. 30 at 0116–17.

On February 6, 2001, in the middle of the guilt phase, Dr. Jackson completed an independent—but repetitive—psychological evaluation of Cabrera.[59] Dr. Jackson's report ("Rockford Report") reached conclusions based on a clinical interview and five psychological evaluation procedures, as well as Dr. Jackson's consideration of Dr. Dougherty's Otero Report, and the mitigation testimony of Stephanie Cabrera and Cabrera's Mother from the Otero Trial.[60] Dr. Jackson found Cabrera to be psychologically strong and Dr. Jackson suggested that Cabrera's "principal psychological defense mechanism is denial" and that Cabrera demonstrated "some tendency to flights of fantasy of an escapist nature."[61] The Rockford Report indicated that Cabrera's evaluation results suggest "the presence of perceptual dysfunction."[62] The Rockford Report concluded, notwithstanding the perceptual dysfunction and denial mechanisms, Cabrera was well-suited to deal with the demands of prison life.[63]

Dr. Jackson also testified that he prepared the Rockford Report with the limited purpose of evaluating Cabrera's ability to adapt to life in prison.[64] When

---

[59] Psychological Evaluation by Dr. Jackson (Feb. 6, 2001), Cabrera Ex. 45 at 0211–13 (hereinafter *Jackson*).

[60] *Id.* at 0211–12.

[61] *Id.* at 0213.

[62] *Id.*

[63] *Id.*

[64] On cross-examination, Dr. Jackson explained that he was "hired to . . . see if there was any possibilities of [Cabrera] being a danger to himself or in a prison setting" for the purposes of explaining that to the jury." Penalty Phase Tr. 2/14/2001 at 104:22–105:1–4. *See also id.* at

17

asked if he had discussed the murders of Saunders and Rowe or any criminal activity at all, Dr. Jackson responded, "No[,] [f]or the simple reason that I didn't have – well, several reasons really, but primarily because it took an extraordinary length of time to do what I had to do, what I was tasked with doing."[65]

At the postconviction hearing, Cabrera Trial Counsel testified that Dr. Dougherty recommended that Dr. Jackson testify at the Rockford Park Trial because Dr. Jackson "was African-American."[66]  According to testimony at the evidentiary hearing, Cabrera Trial Counsel contended that Dr. Jackson was better suited to present to the jury but admitted "[Dr. Jackson] was terrible on the witness stand . . . . [a]nd in hindsight, I would have insisted on Dr. Dougherty instead, but that's in hindsight."[67]  In fact, Cabrera Trial Counsel recalled Dr. Jackson's presentation as "bad," like Dr. Jackson "didn't know what he was talking about," but it was too late for Cabrera Trial Counsel to make a different presentation.[68]

Therefore, an unprepared witness presented the bulk of Cabrera's mitigation evidence to the jury at the penalty phase of the Rockford Park Trial.  The Court is not saying that Cabrera has been prejudiced due to a lackluster witness.  Instead, the Court mentions Dr. Jackson's performance on the witness stand as just one of

---

111:14–15 ("I was given one task, that is to determine whether [Cabrera] would be functional in a [prison] setting structure.").

[65] Penalty Phase Tr. 2/14/2001 at 116:8–11.

[66] Ev. Hr'g Tr. 10/23/2012 at 87:13–15.

[67] *Id.* at 88:2–6.

[68] *Id.* at 88:10–14.

the prejudicial consequences resulting from Cabrera Trial Counsel's untimely and deficient preparation for the penalty phase of the Rockford Park Trial.[69]

## G. Additional Mitigation Evidence was Minimal

In addition to the Rockford Report, Cabrera Trial Counsel presented mitigation evidence through the testimony of Ronda Frazier, Cabrera Sr., Stephanie Cabrera, and Luiz Diaz, cousin of co-defendant Reyes. Ronda Frazier testified, specifically, as to her friendship with Cabrera. Frazier mentioned Cabrera's upbringing and recollections he shared with her, of him having it rough growing up. This prompted the Trial Court to call for a sidebar conference.

## H. The Trial Court Raised Concerns Regarding Defense Evidence Presented

At sidebar, the Trial Court discussed recent involvement in another criminal trial where the trial judge stated that he had spent three days addressing the issue of whether the defendant should present evidence in a penalty hearing. The Trial Court explained to Cabrera Trial Counsel, "I mention this for several reasons. . . . Ronda Frazier regarding how [Cabrera] had opened up to her and mentioned it was rough, the things [Cabrera] had growing up."[70]

It therefore seems that the Trial Court was concerned that potential issues existed because of Cabrera's upbringing and the concern was significant enough to

---

[69] *See Williams*, 529 U.S. at 395 (including defense counsel's delay in conducting its mitigation investigation—specifically, waiting a week before trial began—as a component of defense counsel's ineffectiveness).

[70] Penalty Phase Tr. 2/14/2001 at 122:21, 123:5–7.

19

warrant consideration. Similarly, the State had expressed its concern that certain areas of Cabrera's life had not been explored or investigated, asking, "What was Ronda Frazier talking about when she was alluding to things that [Cabrera] confided in her?"[71]

In response to the inquiry, Cabrera Trial Counsel remained steadfast that, according to Cabrera, "there [were] no family problems" and Cabrera will not admit what other people alleged about his childhood.[72] Cabrera Trial Counsel conceded that it only learned about Cabrera Sr.'s lifestyle, earning a living as a gambler and bookie, *on that day* but that the information did not have "any bearing" on the case.[73] Further, Cabrera Trial Counsel reiterated that Cabrera was very secretive and that counsel deferred to Cabrera's wishes not to reveal anything negative about his childhood.[74] With that, the sidebar conference concluded.

## I. Reliance on Cabrera's Self-Report was Not Reasonable

It is ineffective for defense counsel to abandon an investigation after gathering "'rudimentary knowledge of [the defendant's] history from a narrow set of sources.'"[75] The Otero Report included a section on Cabrera's background but the information was based solely on Cabrera's own recollection of his childhood.

---

[71] *Id.* at 125:16–18.
[72] *Id.* at 123:15–23, 125:1–126:1–6.
[73] *Id.* at 125:2–15.
[74] *Id.* at 126:3–6 ("[CABRERA TRIAL COUNSEL]: Yes[,] [Cabrera] is very secretive . . . . [In] [sic] fact [Cabrera] is probably fuming at the fact that Dr. Jackson made that kind of remark because he idolizes his father.").
[75] *Ploof*, 75 A.3d at 852 (quoting *Wiggins*, 539 U.S. at 524).

Dr. Dougherty took Cabrera's information at face value and Cabrera Trial Counsel did nothing to investigate evidence that might contradict Cabrera's own claims of an average childhood. Furthermore, as the Rockford Park Trial progressed, Cabrera Trial Counsel did nothing to substantiate Cabrera's recollection of his childhood and asked Dr. Jackson to evaluate Cabrera only on how he would fare in prison. Cabrera Trial Counsel's contention that exploration into Cabrera's childhood would have been fruitless based on Cabrera's assertions is unpersuasive. Moreover, it is inconsistent with the mitigating evidence developed in connection with the pending postconviction motion.

Decisional law mandates that defense counsel's strategic decisions properly involve consideration of the defendant's own statements, actions, and preferences.[76] On the other hand, the mitigation investigation cannot be limited to the degree of information offered by the defendant as to his own past. In *Porter v. McCollum*,[77] the United States Supreme Court explained that a "fatalistic or uncooperative [client] . . . does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation."[78] Similarly, in *Rompilla v. Beard*,[79] the United States Supreme Court determined that the defense counsel's mitigation

---

[76] *Strickland*, 466 U.S. at 691.
[77] 558 U.S. 30 (2009).
[78] *Id.* at 40 (alterations in original).
[79] 545 U.S. 374 (2005).

21

investigation was deficient notwithstanding the defendant's minimal contributions and unwillingness to address his past.[80]

## J. A Complete Mitigation Investigation Would Have Revealed Significant Mitigating Evidence that Should Have Been Presented to the Jury

Cabrera's Rule 61 motion presents extensive mitigating evidence that Cabrera Trial Counsel would have uncovered had a proper mitigation investigation been undertaken.

### 1. A Complete Psychological Evaluation Would Have Revealed Significant Mitigating Evidence Including Abuse and Trauma

Cabrera Rule 61 Counsel hired Dr. Victoria Reynolds to evaluate Cabrera's history and the extent of any abuse and/or trauma Cabrera may have experienced during the early years of his life. Dr. Reynolds was retained to determine how trauma may have impaired Cabrera's functioning and development.

Dr. Reynolds interviewed Cabrera on August 27 and 28, 2012, for a total of thirteen (13) hours. Dr. Reynolds also conducted interviews with Cabrera's mother and Daisy Rodriguez, a childhood friend of Cabrera. In addition, Dr. Reynolds reviewed 34 documents such as the Otero Report, the Rockford Report, Cabrera's criminal records, school records, and other records related to Cabrera's social

---

[80] *Id.* at 381–83. The *Rompilla* Court provided, "No reasonable lawyer would forgo examination of the file[s] thinking he could do as well by asking the defendant or family[,]" despite knowing that the State intends to introduce prior convictions and damaging testimony. *Id.* at 389–90.

history.  Dr. Reynolds then issued a twenty (20) page report outlining her findings ("Reynolds Report").[81]

In summary, Dr. Reynolds concluded that Cabrera suffered from a history of physical, emotional, and verbal abuse.  As examples of the prolonged abused suffered by Cabrera, Dr. Reynolds noted eight (8) instances of physical abuse by Cabrera Sr.; thirteen (13) instances of emotional and verbal abuse by Cabrera Sr.; fifteen (15) instances of exposure to domestic violence; and certain recollections of fundamental maternal neglect.[82]  Dr. Reynolds also noted specific instances of trauma including five (5) events of neighborhood violence; three (3) recollections of being assaulted by strangers; and involvement in four (4) accidents resulting in physical injuries.[83]  Some details include:

> [Cabrera] was the scapegoat for most of his father's physical rage. Beginning when [Cabrera] was very young, [Cabrera Sr.] hit [Cabrera] with his hands, belts, whips and hoses . . . . When [Cabrera] was 4 or 5 years old, while visiting a neighbor's house, he stole a lighter.  When the neighbor asked if [Cabrera] had taken the lighter, [Cabrera] admitted it, knowing that what he'd done was wrong. [Cabrera Sr.] reacted by verbally berating [Cabrera], stating that [Cabrera] had 'embarrassed the hell out of him,' and whipping [Cabrera] with a hose . . . . [Cabrera's] mother corroborates [Cabrera's] memory and recalls that [Cabrera Sr.] 'went on a rampage' with the hose and that [Cabrera] fell to the floor from the force of the blows.  [Cabrera's mother] recalls throwing herself over [Cabrera] to protect him and getting hit herself with the hose.  She

---

[81] Psychological Report of Trauma and Its Impact: Luis G. Cabrera by Dr. Reynolds (Oct. 1, 2012), Cabrera Ex. 97 at 0799–0818 (hereinafter *Reynolds*).
[82] *Id.* at 0801–09.
[83] *Id.* at 0809–10.

recalls cleaning [Cabrera] up afterwards and that there were welts on his back and legs. [Cabrera's mother] also recalls that the beatings and screaming coming from their house were so loud that the neighbor from whom [Cabrera] stole the lighter came over and said she felt terrible that [Cabrera] had gotten into so much trouble.[84]

According to Dr. Reynolds, Cabrera also recalled an event where he and his sister were "goofing around with his father's friends' kids, burping, laughing" at a restaurant and, when told to stop, the children continued. Cabrera described the following events to Dr. Reynolds:

> [Cabrera] described how [Cabrera Sr.] 'collared him up,' by picking him up by the front of his shirt, and slammed [Cabrera] against the wall. [Cabrera Sr.] then took off his belt and beat [Cabrera] all over his body.[85]

Dr. Reynolds emphasized, "[Cabrera] summarized the situation as his fault, and was desperate to correct the fact that his father was so upset with him.[86]

In addition, Cabrera Sr. engaged in emotional and verbal abuse against Cabrera throughout Cabrera's childhood. The Reynolds Report included the following examples:

> [Cabrera] recalls hearing his father tell his sister that he wished she'd never been born. More often, however, his father would communicate how disappointed and disgusted he was with [Cabrera].[87]
>
> . . . .

---

[84] *Id.* at 0801–02.
[85] *Id.* at 0802.
[86] *Id.*
[87] *Id.* at 0803.

24

One of the most traumatic experiences [Cabrera] recalls occurred when [Cabrera Sr.] would threaten to ostracize [Cabrera] from the family for his misdeeds. Despite the fact that [Cabrera] wasn't doing anything wrong and was very submissive and accommodating to his father's demands, [Cabrera] recalls [Cabrera Sr.] telling him on several occasions he'd gotten so tired of dealing with [Cabrera] that he was going to send [Cabrera] to a residential home. [Cabrera Sr.] would pick up the phone and dial a number. [Cabrera] believed he was speaking to someone at a residential facility.[88]

Cabrera's mother corroborated Cabrera's claims of physical and emotional abuse and discussed her own maternal neglect of Cabrera. Cabrera's mother recalled watching Cabrera Sr. beat Cabrera with a belt for coming down the stairs after bedtime,[89] and listening to Cabrera Sr. blame his own unhappiness on Cabrera and threaten to abandon and punish Cabrera.[90]

## 2. A Complete Mitigation Investigation Would Have Exposed Cabrera's Deficient Education Record

A proper mitigation defense would also have presented inconsistencies with the information provided by Cabrera for the Otero Trial investigation, including Cabrera's academic history. According to Cabrera, he did well in school and "never failed a class." Relying on Cabrera's self-report, Cabrera Trial Counsel explained to the Trial Court that Cabrera "had an exemplary record . . . . [h]e was a C plus student [and] had only two absences in four years."[91] However, Cabrera's

---

[88] *Id.* at 0804.
[89] *Id.* at 0802.
[90] *Id.* at 0803.
[91] Penalty Phase Tr. 2/14/2001 at 126:11–16.

records do not support these assertions. Even a cursory review of Cabrera's high school transcript shows that Cabrera struggled with school attendance and grades. For example, in his first year of high school, Cabrera failed a basic life sciences class and was absent seven (7) times.[92] Over the next three years, Cabrera's performance and attendance declined. Cabrera failed six (6) classes and was absent 10, 15, and 20 times, respectively, totaling 52 absences over four years.[93] Indeed, Cabrera graduated from high school with a grade point average of 1.4.[94]

Moreover, at the postconviction hearing, Cabrera's high school teacher Ms. Barbara Finnan testified about Cabrera's middle school years and her concerns about his "family environment."[95] Finnan's testimony corroborated the conclusions in the Reynolds Report: Cabrera suffered from hypervigilance and anxiety.[96] The reality of Cabrera's actual high school performance was completely at odds with the presentation made at the Rockford Park Trial.

---

[92] Cabrera's Record Folder-NCC School District, Cabrera Ex. 87 at 0763 (hereinafter *NCC School District*).
[93] *Id.* at 0763.
[94] *Id.* at 0763.
[95] Ev. Hr'g Tr. 10/10/2012 at 12:9–24:1–13. Finnan testified:

> I recall the students who stood out in my classrooms . . . . I thought [Cabrera], because he was, to me, a challenge . . . because of the behavior, I was concerned about the family environment, that perhaps his dad was too strict at home and . . . he might not have the support at home that he might need.

*Id.* at 23:11–17.
[96] *See id.* at 18:8–19:1.

**K. Cabrera Trial Counsel was Ineffective With Respect to the Mitigating Evidence Presented in the Penalty Phase**

To establish ineffective assistance of counsel, *Strickland* requires Cabrera show both unreasonable performance *and* prejudice from such error. To satisfy the prejudice prong—with respect to Cabrera's presentation of new mitigation evidence—Cabrera must prove there is a substantial likelihood that, absent Cabrera Trial Counsel's errors, the Trial Court would have had a reasonable basis to conclude that the balance of aggravating and mitigating circumstances did not warrant death.[97] This Court must "consider *all* the relevant evidence that the [Trial Court] would have had before [it] if [Cabrera Trial Counsel] had pursued a different path."[98]

### 1. Cabrera Trial Counsel's Performance Fell Below an Objective Standard of Reasonableness with Respect to Mitigation

Consideration of the first prong of *Strickland* requires an analysis of whether the performance of Cabrera Trial Counsel fell below an objective standard of reasonableness. Cabrera Trial Counsel's strategy ignored the importance of a mitigation investigation in capital cases.[99] Cabrera Trial Counsel did not present

---

[97] *Strickland*, 466 U.S. at 695; *Ploof*, 75 A.3d at 886–87 (Strine, C., dissenting) (explaining the importance of presenting mitigating evidence to a jury in light in Delaware's death penalty scheme and for purposes of the prejudice prong of *Strickland*).

[98] *Taylor 2011*, 32 A.3d at 382 (alteration in original) (internal quotation omitted).

[99] *See Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L.Rev. 299 (1983). Goodpaster discusses the role of defense counsel in a capital case in the following terms:

mitigation evidence as to Cabrera's childhood, upbringing, family, or otherwise. The decision to rely on the Otero Trial investigation was unreasonable because it was incomplete and it was presented by an unsatisfactory witness who conducted only a cursory interview with Cabrera, and did not speak to family members or review any objective documentation from Cabrera's childhood.

Cabrera Trial Counsel faced difficulty when attempting to glean insight into the unflattering details of Cabrera's background because Cabrera was reluctant to expose his traumatic history and abusive childhood. Nonetheless, Cabrera Trial Counsel had a duty to conduct an independent investigation. For example, Cabrera Trial Counsel did not pursue exploration into Cabrera's childhood in light of Dr. Dougherty's later concerns of abuse and conclusion that Cabrera refused to acknowledge certain shortcomings.[100]

This Court is cautious to avoid the distorting effects of hindsight when evaluating Cabrera Trial Counsel's conduct and the Court recognizes that Cabrera continued to deny any allegations that he suffered as a child and respects the

> As an advocate . . . defense counsel has the related but distinct function of attempting to persuade the jury to exercise mercy. Defense counsel therefore has both the opportunity and the duty to present potentially beneficial mitigating evidence and to attempt to convince the sentencer that, notwithstanding the defendant's guilt, he or she is a person who should not die. Once the defendant has been found guilty of a capital crime, a life sentence is counsel's only remaining advocacy goal. As an advocate for life, counsel must attempt to demonstrate that mitigating factors outweigh aggravating factors and must present the sentencer with the most persuasive possible case for mercy.

*Id.* at 318.

[100] *See* Otero Tr. 6/3/1998 at 49:16–50:1–19, 50:21–52:1–23, State's App. at B-46.

influence such denial had upon Cabrera Trial Counsel's presentation.[101]

Nevertheless, Cabrera Trial Counsel had a duty to conduct more than a rudimentary investigation, especially in light of suspicions or concerns of issues that might have uncovered mitigating evidence. Indeed, the Otero Trial investigation and limited supplemental Rockford Park Trial investigation overlooked certain indications—or red flags—of underlying issues related to Cabrera's childhood that a reasonable attorney would have explored in an attempt to uncover mitigation evidence.

In certain circumstances, defense counsel must "do more" to uncover mitigating evidence.[102] Because Cabrera Trial Counsel's strategy relied on the undeveloped information obtained in the Otero Trial mitigation investigation supplemented by the Rockford Report, without more, its performance fell below an objective standard of reasonableness.[103] The first prong of *Strickland* is satisfied.

---

[101] *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

[102] *See Ploof*, 75 A.3d at 855 ("We disavow any attempt to create a rigid rule that a defense attorney is ineffective whenever that attorney fails to uncover potential mitigating evidence, no matter how unapparent. We conclude only that, in these specific circumstances, Trial Counsel needed to do more.").

[103] *See id.* at 853–55.

**2. Cabrera Suffered Prejudice Because There is a Reasonable Likelihood that the Result of the Proceeding Would Have Been Different**

A proper mitigation defense would have presented an entirely different picture of Cabrera's background. Cabrera Trial Counsel interviewed Cabrera as the sole source of information of Cabrera's childhood. On the other hand, Dr. Reynolds testified at the postconviction hearing that talking solely to the abuse victim is never sufficient because victims tend to minimize "what is objectively abusive."[104]

As another example, Cabrera Trial Counsel failed to contact any of Cabrera's high school teachers to verify Cabrera's claims that he did well in school, and did not even obtain Cabrera's school records to substantiate his claims that he did "well" in school.[105] Cabrera Trial Counsel's claims of Cabrera's "exemplary" high school experience sharply contrasted to the reality of his high school experience.

---

[104] Ev. Hr'g Tr. 10/25/2012 at 115:10–21.
[105] *But see* Cabrera Trial Counsel Aff. ¶ 14:

> Denied. Counsel was in possession of all relevant mitigation evidence from Cabrera's first trial. This information was supplemented by interviewing Cabrera's family members and friends regarding their contact with Cabrera while incarcerated. Cabrera's disciplinary file was also reviewed to ascertain how he was adjusting to prison life. All information from the [Otero Trial] as well as any newly obtained information was given to [Dr. Jackson], who interviewed and tested Cabrera prior to the penalty phase of his [Rockford Park Trial].

30

In addition, even the limited investigation by Defense Investigator identified multiple individuals who could discuss Cabrera's background but Cabrera Trial Counsel never interviewed a majority of the individuals identified by Defense Investigator.[106] Cabrera Trial Counsel's opening statement from the penalty phase of the Rockford Park Trial highlights Counsel's strategy. In relevant part, counsel stated:

> You are **not** going to hear that Luis Cabrera had a terrible upbringing, that his father was an alcoholic that beat him; that he is a social outcast. That is not going to come out. Luis Cabrera is basically - - there is nothing wrong with him. No explanation for the things he has done. That is the tough part. . . . You are going to hear from [Cabrera Sr.] [a]nd the message is simple, don't do to our [family] what [Cabrera] did to others. Give [Cabrera] life.[107]

Cabrera Trial Counsel's failure to conduct a complete and thorough investigation prejudiced Cabrera. That there was "nothing wrong" as actually presented by Cabrera Trial Counsel was inaccurate and woefully deficient. Had Cabrera Trial Counsel presented a mitigation case at the penalty phase that accurately presented Cabrera's childhood and upbringing, there is a substantial likelihood that the jury would have had recommended life rather than death. The second prong of *Strickland* is satisfied.

---

[106] *See* Ev. Hr'g Tr. 10/23/2012 at 92:1–93:1–10.
[107] Penalty Phase Tr. 2/13/2001 at 29:7–20 (emphasis added). *See also* Ev. Hr'g Tr. 10/23/2012 at 91:3–10.

### 3. The Remedy for Ineffective Assistance of Counsel During the Penalty Phase is to Vacate the Death Sentence Imposed by the Trial Court

Cabrera was entitled to have the extensive mitigating evidence presented to a jury for its consideration in reaching a sentencing recommendation.[108] This Court finds that Cabrera Trial Counsel provided ineffective assistance of counsel with respect to the mitigation investigation, the lack of preparation for the penalty phase, and the inaccurate presentation of Cabrera's childhood and upbringing. Under *Strickland*, the appropriate remedy is for Cabrera's death sentence to be vacated.

## V. CABRERA IS NOT ENTITLED TO RELIEF FOR HIS REVERSE-*BATSON* CLAIM BECAUSE IT DOES NOT SATISFY *STRICKLAND*

This Court will consider the merits of procedurally sufficient constitutional claims as well as any colorable claim of ineffective assistance of counsel. Cabrera's reverse-*Batson* claim will be addressed on the merits as a claim of ineffective assistance of counsel. Cabrera argues that Cabrera Trial Counsel's representation was ineffective because Counsel purposefully discriminated against jurors on the basis of race during jury selection thereby committing a reverse-*Batson* violation of the Equal Protection Clause of the Fourteenth Amendment.

---

[108] *See* 11 *Del. C.* § 4209.

## A. Purposeful Discrimination in Jury Selection is Prohibited

In *Batson v. Kentucky*,[109] the United States Supreme Court held that discrimination on account of race in selection of jurors, by the State, is prohibited and a prosecutor's "racial discrimination . . . violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure."[110] In *Powers v. Ohio*,[111] the Supreme Court expanded *Batson*, holding that "a criminal defendant may object to race-based exclusion of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races."[112] One year later, in *Georgia v. McCollum*,[113] the Supreme Court expanded *Batson* again, holding that criminal defendants, like prosecutors, were prohibited from engaging in purposeful discrimination on ground of race.[114] A *Batson* objection to the defendant's exercise of a peremptory challenge is known as a reverse-*Batson* claim.[115] *Batson* and its decisional progeny teach reciprocity of equal protection and warn that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the

---

[109] 476 U.S. 79 (1986).
[110] *Id.* at 86, 98.
[111] 499 U.S. 400 (1991).
[112] *Id.* at 402.
[113] 505 U.S. 42 (1992).
[114] *Id.* at 59 ("[T]he exercise of a peremptory challenge must not be based on either the race of the juror or the racial stereotypes held by the party."). The *McCollum* Court explained that discrimination during jury selection upsets "the fairness of, and public confidence in, the criminal justice system[,]" and "undermine[s] the very foundation of our system of justice." *Id.* at 48–49.
[115] *State v. McCoy*, 112 A.3d 239, 249 (Del. 2015).

entire community."[116]  The prohibition of purposeful discrimination preserves the integrity of the criminal justice system.[117]

**B. Cabrera Trial Counsel Utilized a Racially-Motivated Strategy in Jury Selection to Exclude Three Black Potential Jurors**

Cabrera Trial Counsel pursued a racially-motivated strategy during jury selection by strategically excluding black males and mothers of young black males from the jury.  Specifically, Cabrera Trial Counsel exercised peremptory challenges to exclude three black potential jurors from the jury of the Rockford Park Trial.[118] Also, Cabrera Trial Counsel expressed a preference for Hispanic jurors.[119]

The first reference to considerations of juror race during jury selection was a discussion on the record initiated by Cabrera Trial Counsel:

> MR. FIGLIOLA:  Your Honor, we're not going to - - I'd like to say something.  We're not going to oppose [the State's strike of Mr. Caraballo for cause].  I don't think we can . . . . However, out of a jury very near of 157, [Mr. Caraballo] was the only Hispanic.
>
> MR. WOOD:  That's not true.
>
> THE TRIAL COURT:  Well, [Mr. Caraballo] was the only one marked Hispanic.
>
> MR. FIGLIOLA:  Only one marked Hispanic.  For that reason - -

---

[116] *Batson*, 476 U.S. at 87.

[117] *Powers*, 499 U.S. at 413–14.

[118] Jury Selection Tr. 1/10/2001 at 179:15–16; Jury Selection Tr. 1/11/2001 at 167:8–9; Jury Selection Tr. 1/12/2001 at 151:10–11.

[119] *See* Jury Selection Tr. 1/12/2001 at 120:5–21; Ev. Hr'g Tr. 10/23/2012 at 42:7–13.

THE TRIAL COURT:  I understand.

MR. WOOD:  Well, let's flush out that record.

MR. FIGLIOLA:  For that reason, we were anxious, if at all possible, to have Mr. Caraballo qualify as a juror.[120]

The second reference to considerations of race during jury selection took place after Cabrera Trial Counsel exercised a third peremptory challenge against a black potential juror and the Trial Court initiated the following colloquy:

> THE TRIAL COURT:  Before the next juror, please, I don't mean to pull the pin out of the hand grenade, but that's at least the third African-American the defense has stricken.  Two others were females, as I recall, and one of them was a male, too.
>
> MR. WOOD:  Your Honor has correctly recounted the record pertaining to the defense use of strikes.  We have no application at this time, however.
>
> MR. DECKERS:  Does the Court wish for me to make a record?
>
> THE TRIAL COURT:  You might want to protect yourself, sure.
>
> MR. DECKERS:  Well, I don't - -
>
> MR. WOOD:  We have no application at this time and, in particular, we are not alleging, nor do we ask the [Trial] Court to find that a prima facie case of racial animus in the exercise of peremptory challenges has been shown by this record.
>
> THE TRIAL COURT:  Okay.  I make no such finding anyway.  I'm not making a finding.  I'm merely making an observation.[121]

---

[120] Jury Selection Tr. 1/12/2001 at 120:5–21
[121] *Id.* at 152:9–153:1–8.

35

The third discussion of considerations of race during jury selection took place when the Trial Court conducted an evidentiary hearing pursuant to Rule 61(h), at which hearing Cabrera Rule 61 Counsel questioned Cabrera Trial Counsel on its jury selection strategy, as follows:

> CABRERA RULE 61 COUNSEL: What do you recall about your strategy in selecting jurors in this case and how you decided to use your peremptory strikes?
>
> . . . .
>
> CABRERA TRIAL COUNSEL: We . . . went in to the jury attempting to get jurors that we thought would be more inclined to find an acquittal. Specifically, I don't think we wanted *any young black males*. We didn't want any *mothers of young black males* . . . which is somewhat unusual when you go into a murder case, because generally those people would tend not to give the death penalty.
>
> CABRERA RULE 61 COUNSEL: Do you recall executing that strategy and using your strikes?
>
> CABRERA TRIAL COUNSEL: I'm pretty sure we did. I think we did.
>
> CABRERA RULE 61 COUNSEL: Do you recall indicating to the [Trial] Court during jury selection that you were hopeful to have Hispanic jurors seated in this case?
>
> CABRERA TRIAL COUNSEL: I don't recall that, but it would not surprise me, if we did.
>
> CABRERA RULE 61 COUNSEL: Why not?
>
> CABRERA TRIAL COUNSEL: Because [Cabrera] was Hispanic.[122]

---

[122] Ev. Hr'g Tr. 10/23/2012 at 40:22–23, 41:16–23, 42:4–13 (emphasis added).

36

Therefore, the record supports a finding that Cabrera Trial Counsel made a deliberate and racially-motivated decision to *exclude* from the jury young black males and mothers of young black males on the assumption that these individuals would be sympathetic to the victims, Saunders and Rowe.  In addition, Cabrera Trial Counsel's racially-motivated strategy for jury selection was to *include* Hispanic jurors solely because that Cabrera is Hispanic.[123]

## C. Race-Based Selection of Jurors Was Not Challenged at Rockford Park Trial or on Direct Appeal

A reverse-*Batson* claim was not raised during jury selection for the Rockford Park Trial.  Had a reverse-*Batson* claim been raised directly, the three-step inquiry delineated by the Delaware Supreme Court in its decision in *McCoy v. State*, would have been required:

> First, the trial judge must determine whether the State has made a *prima facie* showing that the defendant exercised a peremptory challenge on the basis of race.  Second, if the showing is made, the burden shifts to the defendant to present a race-neutral explanation for striking the juror in question . . . . [S]o long as the reason is not inherently discriminatory, it suffices. Third, the trial judge must then determine whether the State has carried its burden of proving purposeful discrimination.  This final step involves evaluating the persuasiveness of the justification proffered by the defendant, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.[124]

---

[123] *See Powers*, 499 U.S. at 402 ("[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races.").

[124] *McCoy*, 112 A.3d at 251 (internal citations omitted).

In connection with this three-step inquiry, the Trial Court might have exercised the court's discretion to prevent Cabrera Trial Counsel from exercising peremptory challenges in a racially-motivated manner. However, the three-step inquiry did not take place because there was no challenge by Cabrera or the State.

If a reverse-*Batson* claim had been raised on direct appeal, and the Delaware Supreme Court found a reverse-*Batson* error, then Cabrera would have been entitled to a presumption of prejudice because *Batson* errors qualify as structural error. Structural errors are "defects in the constitution of the trial mechanism" that infect the "entire conduct of the trial from beginning to end."[125] Structural errors deprive defendants from basic protections without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair."[126]

However, in the case now pending before this Court, no reverse-*Batson* error was raised during jury selection or on direct appeal. Furthermore, the Trial Court did *not* impede on Cabrera Trial Counsel's exercise of peremptory challenges.[127] Indeed, Cabrera Trial Counsel exercised Cabrera's peremptory challenges in the exact manner they intended. Nevertheless, Cabrera asserts that this Court should address his reverse-*Batson* claim on the merits as structural error on the grounds

---

[125] *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *Neder v. U.S.*, 527 U.S. 1, 8–9 (1999).

[126] *Fulminante*, 499 U.S. at 310 (internal citation omitted).

[127] *Cf. McCoy*, 112 A.3d 239 (Del. 2015); *Sells v. State*, 109 A.3d 568 (Del. 2015).

that this type of error by Cabrera Trial Counsel satisfies the miscarriage of justice exception and requires grating a new trial.  This Court disagrees and finds that Cabrera's reverse-*Batson* claim may be presented in this postconviction proceeding for the first time only as a claim of ineffective assistance of counsel and as discussed below, prejudice *must* be established. Moreover, this Court finds, as discussed below, that there was no miscarriage of justice in the guilt phase of Cabrera's Rockford Park Trial.

**D. Cabrera's Case is Distinguishable from *McCoy v. State* and *Sells v. State* because Cabrera's Reverse-*Batson* Claim is Asserted in Postconviction Proceedings**

In 2015, the Delaware Supreme Court issued two decisions overturning judgments of conviction against defendants on grounds of reverse-*Batson* error.[128] In *McCoy*, the defendant had exercised fourteen peremptory challenges to exclude white jurors.[129]  When the *McCoy* defendant exercised his fifteenth peremptory challenge, the trial judge *sua sponte* sought a justification from the defendant.[130] Despite two race-neutral explanations, the trial judge refused to accept the defendant's peremptory challenge.[131]  Upon the defendant's appeal from his death sentence, the Delaware Supreme Court concluded that the trial court "committed

---

[128] *See also Grimes v. State*, 2015 WL 2015 WL 2231801 (Del. May 12, 2015) (vacating the judgment of convictions entered against Grimes in the same trial as William S. Sells, III, for the reasons set forth in the *Sells v. State* decision).
[129] *McCoy*, 112 A.3d at 249–50.
[130] *Id.* at 250.
[131] *Id.*

reversible error when it improperly denied [the defendant]'s right to exercise a peremptory challenge to strike a potential juror."[132]   The Supreme Court determined a new trial was the proper remedy because trial court's error violated the defendant's right to a fair trial with a jury panel comprised of impartial jurors.[133]   Specifically, the improper denial of the defendant's peremptory challenge "forced the defendant to be judged by a jury that includes a juror that was objectionable to him."[134]

In *Sells*, the State made a reverse-*Batson* challenge during jury selection arguing that the defendant, a minority, was engaging in racial discrimination by using two of his three peremptory challenges to strike white jurors.[135]   The trial court found that the defendant had engaged in a "pattern of racial discrimination" and required the defendant to provide reasons for exclusion of jurors during the remaining process of jury selection.[136]   The defendant appealed his conviction on the grounds that the trial court erred when the court allowed the State's reverse-*Batson* challenge.  The Delaware Supreme Court determined that the trial court had improperly restricted the defendant's ability to use his peremptory challenges by requiring that the defendant articulate a non-discriminatory reason for exercising

---

[132] *Id.* at 245.
[133] *Id.* at 254–58.
[134] *Id.* at 257–58.
[135] *Sells*, 109 A.3d at 577.
[136] *Id.* at 578.

his peremptory strikes.[137]  Accordingly, the Supreme Court vacated the judgment of conviction that resulted from the trial.[138]

Cabrera's case is distinguishable from *McCoy* and *Sells* because neither the State nor the Trial Court raised a reverse-*Batson* claim against Cabrera Trial Counsel *during jury selection* for the Rockford Park Trial.  Next, Cabrera's case is distinguishable because Cabrera–rather than the State or the Trial Court–has raised the reverse-*Batson* claim *against his own counsel* in a different procedural context: postconviction relief.  Finally, unlike in *McCoy* and *Sells*, Cabrera was not prevented from exercising his peremptory challenges.  Indeed, Cabrera's Rockford Park Trial jury was comprised of the jurors Cabrera Trial Counsel thought best suited to consider Cabrera's case.

**E. To Prevail on His Reverse-*Batson* Claim, Cabrera Must Demonstrate that Cabrera Trial Counsel's Strategy of Race-Based Jury Selection was Ineffective Assistance of Counsel**

To prevail on his reverse-*Batson* claim, Cabrera must satisfy the test set forth in *Strickland*: (1) Cabrera Trial Counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for the errors, the result of the proceeding would have been different.[139]

---

[137] *Id.* at 579–82.
[138] *Id.* at 582.
[139] *Strickland*, 466 U.S. at 687.

**1. Cabrera Trial Counsel's Racially-Motivated Jury Selection Strategy Fell Below an Objective Standard of Reasonableness under *Strickland***

Cabrera Trial Counsel's racially-motivated strategy was inconsistent with the teachings of *Batson*, *Powers*, and *McCollum*. Indeed, such conduct is unequivocally banned in that "[d]efense counsel is limited to 'legitimate, lawful conduct.'"[140] While a defendant has "the right to an impartial jury that can view him without racial animus," the Sixth Amendment right to effective counsel does not give the defendant "the right to carry out through counsel an unlawful course of conduct."[141] As the *McCollum* Court explained:

> [T]here is a distinction between exercising a peremptory challenge to discriminate invidiously against jurors on account of race and exercising a peremptory challenge to remove an individual juror who harbors racial prejudice. This Court firmly has rejected the view that assumptions of partiality based on race provide legitimate basis for disqualifying a person as an impartial juror. As this Court stated . . . in *Powers*, '[w]e may not accept as a defense to racial discrimination the very stereotype the law condemns.'[142]

Delaware law is consistent with these principles. According to Delaware's Rules of Professional Conduct ("Rules"), a Delaware lawyer's conduct "should conform to the requirements of the law."[143] The Rules confer upon the client the ultimate authority to determine the scope and purposes of the legal representation

---

[140] *McCollum*, 505 U.S. at 57 (quoting *Nix v. Whiteside*, 475 U.S. 157, 166 (1986)).

[141] *Id.* at 58.

[142] *Id.* at 59 (quoting *Powers*, 499 U.S. at 410).

[143] Del. Lawyers' R. Prof'l Conduct Preamble, 5; Del. Lawyers' R. Prof'l Conduct 8.4(d) (providing that any course of action that is "prejudicial to the administration of justice" is professional misconduct).

but simultaneously require that the lawyer act "*within the limits imposed by law and the lawyer's professional obligations.*"[144]

Furthermore, labeling Cabrera Trial Counsel's conduct as "strategic," does not change the analysis. *Batson* serves to protect the interests of defendants, prosecutors and, most importantly; *Batson* serves to protect the interests of prospective jurors and society's interest in an unbiased judicial system.[145] *Batson* is clear that "[c]ompetence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at trial[,] [and] [a] person's race simply is unrelated to his fitness as a juror."[146]

In light of the well-settled decisional law, this Court concludes that Cabrera Trial Counsel's exercise of peremptory challenges in furtherance of the admittedly race-based juror selection strategy constituted a reverse-*Batson* error that was not consistent with prevailing professional norms. Accordingly, the first prong of *Strickland* is satisfied because Cabrera Trial Counsel's performance fell below an objective standard of reasonableness.

---

[144] Del. Lawyers' R. Prof'l Conduct 1.2, cmt. 1 (emphasis added). *See also* Del. Lawyers' R. Prof'l Conduct Preamble, 9 (noting that "the lawyer's obligation zealously to protect and pursue a client's legitimate interests, *within the bounds of the law*[.]") (emphasis added).
[145] *Batson*, 476 U.S. at 99.
[146] *Id.* at 87 (internal citation omitted).

**2. Cabrera Must Demonstrate Prejudice under the Second Prong of *Strickland***

Cabrera contends that prejudice from Cabrera Trial Counsel's reverse-*Batson* error is presumed under *Strickland* because the error is so egregious that it amounts to a "structural error" and requires a new trial. This Court rejects Cabrera's argument that prejudice must be presumed. Rather, this Court finds that the second prong of *Strickland* requires that Cabrera demonstrate actual prejudice: that, but for Cabrera Trial Counsel's reverse-*Batson* error, the result of the proceeding would have been different.

Courts are split between two prevailing schools of thought on how to evaluate the prejudice prong of a *Strickland* claim based on a reverse-*Batson* error. Either prejudice is presumed because a reverse-*Batson* error is a structural error[147] or there must be specific instances of prejudice that demonstrate a reasonable probability that the results of the proceeding would have been different absent defense counsel's exercise of peremptory strikes.[148]

Cabrera asks this Court to follow the former. In support, Cabrera relies on the Seventh Circuit Court of Appeals' decision in *Winston v. Boatwright*, in which the Court of Appeals held "[u]nconstitutional juror strikes, like other structural

---

[147] *See generally Winston v. Boatwright*, 649 F.3d 618 (7th Cir. 2011) (discussing the prejudice prong of a *Strickland* on grounds of a reverse-*Batson* error).
[148] *See U.S. v. Kehoe*, 712 F.3d 1251, 1253–54 (8th Cir. 2013) (relying on the decision in *Young v. Bowersox*, 161 F.3d 1159 (8th Cir. 1998) to reject the defendant's argument that an ineffective claim based on a *Batson* error requires a presumption of prejudice).

errors, create the kind of problem that def[ies] analysis by harmless error standards."[149] In light of this conclusion, the *Winston* Court concluded that despite *Strickland's* call for an examination of prejudice, reverse-*Batson* errors are included in the "limited class on fundamental constitutional errors"[150] where "prejudice is so likely that 'case-by-case inquiry into prejudice is not worth the cost'—'prejudice is presumed.'"[151]

Absent Delaware precedent on this issue, this Court declines to extend the well-settled Delaware law under *Strickland* that requires a finding of actual prejudice. According to *Strickland*, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[152] The heavy burden of satisfying the *Strickland* prejudice prong is the defendant's burden.[153]

---

[149] *Winston*, 649 F.3d at 633 (internal citation omitted).
[150] *Id.* at 632 (citing *Neder*, 527 U.S. at 7).
[151] *Id.* at 633 (citing *Strickland*, 466 U.S. at 692).
[152] *Strickland*, 466 U.S. at 686.
[153] *See Younger*, 580 A.2d at 555 ("[I]n a postconviction proceeding, the petitioner has the burden of proof and must show that he has been deprived of a substantial constitutional right before he is entitled to any relief.").

**3. Cabrera Was Not Prejudiced by Cabrera Trial Counsel's Reverse-*Batson* Error as Required for Relief under *Strickland* Because there is No Reasonable Likelihood that the Result of the Rockford Park Trial Would Have Been Different Absent Cabrera Trial Counsel's Reverse-*Batson* Error**

Cabrera's claim of ineffective counsel requires this Court consider whether the reverse-*Batson* error committed by Cabrera Trial Counsel prejudiced Cabrera. Under *Strickland*, Cabrera bears the burden of establishing prejudice suffered as a result of Cabrera Trial Counsel's errors. Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[154] Cabrera must make specific and substantiated allegations of prejudice.[155] Failure to do so undermines Cabrera's claim of ineffective counsel.[156]

Even though Cabrera Trial Counsel's performance was deficient, Cabrera has not demonstrated that he suffered prejudice under the second prong of *Strickland*. Cabrera had a trial by jury, with the jurors that his lawyers thought would be most sympathetic to him.[157] Cabrera has not demonstrated prejudice to his interests.

---

[154] *Strickland*, 466 U.S. at 694; *Hoskins v. State*, 102 A.3d 724, 730 (Del. 2014).
[155] *Wright 1996*, 671 A.2d at 1356.
[156] *Dawson*, 673 A.2d at 1196.
[157] Cabrera's Rockford Park Trial jury consisted of eight females and four males. Seven of the female jurors represented their race as "white" and one represented her race as "black." Of the four male jurors, two identified as "white" and the other two did not identify with a specific race. *See* Juror Profile (Jan. 9, 2001), Cabrera Ex. 32, 33 at 0121–0173.

46

This Court recognizes that Cabrera Trial Counsel's reverse-*Batson* error harmed the interests of the public as well as the integrity of the criminal justice system. This Court does not condone–nor does the law permit–Cabrera Trial Counsel's conduct. Yet, Cabrera has not demonstrated that *he* suffered *actual* prejudice from Cabrera Trial Counsel's reverse-*Batson* error. Therefore, upon consideration of the record and the decisional law of *Batson* and *Strickland*, this Court finds that Cabrera has failed to make a showing of actual prejudice and, therefore, the second prong of *Strickland* is not satisfied. Accordingly, Cabrera has not demonstrated that Cabrera Trial Counsel was ineffective in connection with Cabrera's reverse-*Batson* claim.

## VI. CABRERA CANNOT ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL ON OTHER CLAIMS RELATED TO THE PENALTY PHASE

This Court will consider the merits of procedurally sufficient constitutional claims as well as any colorable claim of ineffective assistance of counsel. With respect to the penalty phase of the Rockford Park Trial, in addition to the arguments related to the mitigation investigation,[158] Cabrera contends that Trial Counsel was ineffective for failing to argue residual doubt as a mitigating factor; failing to object to the introduction of details regarding the Otero murder; failing to object to the presentation of transcript testimony for Reyes and Wilson Serrano; and failing to object to the State's argument that the death penalty was the only

---

[158] *See supra* Section IV.

appropriate sentence for Cabrera. Presentation of evidence at a penalty hearing is quite broad if admissible as relevant under 11 *Del. C.* § 4209(c).[159]

## A. Residual Doubt as a Mitigating Factor

Cabrera contends Cabrera Trial Counsel was ineffective for failing to argue residual doubt as a mitigating factor during the penalty phase because the State presented solely circumstantial evidence and because the jury was deadlocked before receiving an *Allen* charge. According to Cabrera, Cabrera Trial Counsel's failure to argue residual doubt deprived Cabrera of the opportunity to have the jury consider a powerful mitigating factor.

Cabrera is correct that neither the United States of Delaware Constitutions, nor the applicable decisional law, *prohibits* capital defendants from relying on residual doubt.[160] However, the constitutions and decisional law do not *require* a presentation in the penalty phase regarding residual doubt. Indeed, the United States Supreme Court has definitively stated that defendants have no "right to demand jury consideration of 'residual doubts' in the [penalty] phase."[161]

---

[159] *See* 11 *Del. C.* § 4209(c) (providing that at a death penalty hearing, "evidence may be presented as to any manner that the Court deems relevant and admissible to the penalty to be imposed[,]" including all matters related to mitigating and aggravating circumstances).

[160] *See Franklin v. Lynaugh*, 487 U.S. 164, 173–75 (1988); *Zebroski v. State*, 822 A.2d 1038, 1049–51 (Del. 2003), *impliedly overruled on other grounds in Steckel v. State*, 882 A.2d 168, 171 (Del. 2005); *Shelton v. State*, 744 A.2d 465, 496–97 (Del. 1999) (explaining that there is no blanket *exclusion* from discussing residual doubt).

[161] *Franklin*, 487 U.S. at 173, 174.

48

Even if this Court agreed that Cabrera Trial Counsel's conduct unreasonably deprived Cabrera of the opportunity to have the jury consider residual doubt, Cabrera has not provided specific allegations of prejudice. Cabrera's conclusory assertion that Cabrera Trial Counsel should have argued residual doubt does not satisfy the requirements of the two-prong *Strickland* analysis. Cabrera Trial Counsel's strategic decision not to offer an argument regarding residual doubt did not fall below an objective standard of reasonableness.

## B. Presentation of Luis Reyes' and William Serrano's Testimony by Transcript rather than Calling Witnesses Live

At the penalty phase of the Rockford Park Trial, the State read the prior testimony of Reyes and Serrano from the Otero Trial into the record for the jury's consideration.[162] Reyes' Otero Trial testimony discussed Reyes' relationship with Cabrera and the circumstances of the Otero murder.[163] Serrano's Otero Trial testimony discussed a statement allegedly made by Cabrera in which Cabrera admitted Cabrera had killed someone.[164] Cabrera argues that Cabrera Trial Counsel was ineffective for failing to object to the presentation of prior testimony of Reyes and Serrano by reading transcripts instead of calling each witness to testify in court with the opportunity for cross-examination.

---

[162] Reyes testified against Cabrera at the Otero Trial.
[163] Penalty Phase Tr. 2/13/2001 at 33:1–142:1–15 (reading of Reyes' testimony).
[164] *Id.* at 146:9–183:1–2 (reading of Serrano's testimony).

49

### 1. Testimony of Reyes from Otero Trial

With respect to the prior testimony of Reyes, Cabrera argues the testimony was inadmissible as hearsay. Specifically, Cabrera claims the State's reading of Reyes' prior testimony violated Cabrera's right to confrontation because Cabrera Trial Counsel failed to object to the State introduction of the testimony in a manner that denied Cabrera the opportunity to cross-examine Reyes or otherwise test the accuracy of Reyes' testimony and his credibility as a witness.[165]

Cabrera's arguments do not satisfy *Strickland*. First, Reyes' prior testimony was admissible evidence under 11 *Del. C.* § 4209(c) which states that, at a death penalty hearing, "evidence may be presented as to any manner that the Court deems relevant and admissible to the penalty to be imposed," including all matters related to mitigating and aggravating circumstances. Delaware decisional law permits a "very wide range of evidence . . . in a penalty hearing."[166] Accordingly, any objection by Cabrera Trial Counsel would have been futile as Reyes' prior testimony was relevant to the penalty phase of the Rockford Park Trial.

Furthermore, Cabrera Trial Counsel did not object because Cabrera "through his trial counsel in the Otero case, had a full and fair opportunity to cross-examine

---

[165] *See Wheeler v. State*, 36 A.3d 310, 317–18 (Del. 2012) ("[T]he Confrontation Clause prohibits the admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (alteration in original) (internal quotation omitted)).

[166] *State v. Cohen*, 634 A.2d 380, 384 (Del. Super. 1992) (internal citation omitted).

Reyes."[167]  In addition, even if Cabrera Trial Counsel would have objected to the reading of Reyes' testimony, Reyes' most certainly would have invoked his Fifth Amendment right because his Rockford Park Trial was still pending.[168]

The decisions by Cabrera Trial Counsel not to object to the presentation of Reyes' prior testimony by transcript did not fall below an objective standard of reasonableness.  Accordingly, Cabrera fails to satisfy the *Strickland* test.

## 2.  Prior Testimony of Serrano from Otero Trial

With respect to the prior testimony of Serrano, Cabrera Trial Counsel did not object to the reading of Serrano's testimony transcript.  Indeed, after consulting with Cabrera, Counsel agreed with the transcript presentation.  Cabrera Trial Counsel stated at side bar:

> Your Honor . . . [the State] had asked . . . whether we would object to handling . . . Mr. Serrano in the same manner [as] Mr. Reyes or [if] we'll [sic] require Mr. Serrano to be present.  [Cabrera Trial Counsel] also had discussed it with Mr. Cabrera, and . . . it was our intention even if Mr. Serrano came in we were going to introduce his testimony from the [Otero Trial] hearing . . . .  Therefor[e] [Cabrera Trial Counsel] ha[s] no objection to [Serrano's testimony] being handled in this manner.[169]

Furthermore, Cabrera Trial Counsel explained to the Trial Court that Cabrera had been informed of his right to confront Serrano and Cabrera and

---

[167] Cabrera Trial Counsel Aff. ¶ 20(c).
[168] By contrast, in connection with his testimony at the Otero Murder Trial, Reyes had already entered a guilty plea in connection with Otero's death, waiving his right to assert his Fifth Amendment privileges against self-incrimination. *See Boykin v. Alabama*, 395 U.S. 238 (1969).
[169] Penalty Phase Tr. 2/13/2001 at 144:22–145:1–11.

acknowledged waiver of "whatever evidentiary rules may inhibit or prevent or create difficulty for introduction of [Serrano's] transcript . . . ."[170] Cabrera Trial Counsel explained that Cabrera was "well aware . . . . [and] accepted it."[171]

This Court finds that the record demonstrates that Cabrera Trial Counsel made a reasonable strategic decision regarding the presentation of Serrano's prior testimony. The decision by Cabrera Trial Counsel not to object to the presentation of Serrano's prior testimony by transcript did not fall below an objective standard of reasonableness. Accordingly, Cabrera fails to satisfy the *Strickland* test.

### 3. State's Detailed Presentation Regarding Otero Murder

Cabrera contends that, although the parties stipulated to the admission into evidence of Cabrera's criminal record, the State nonetheless presented additional evidence concerning the "gruesome details" of the Otero murder. According to Cabrera, Cabrera Trial Counsel should have objected and did not do so thereby providing ineffective assistance of counsel. Cabrera argues that Cabrera Trial Counsel should have objected to this presentation as prejudicial under Delaware Rule of Evidence 403, which applies with equal force in the penalty phase of trial[172] and prohibits the use of evidence if its probative value is substantially outweighed by the prejudice caused to the defendant.

---

[170] *Id.* at 145:12–15, 145:23–146:1–2.
[171] *Id.* at 145:23–146:1–2.
[172] *See Gregg v. Georgia*, 428 U.S. 153, 203–04 (1976); *Cohen*, 634 A.2d at 385.

In support of this claim, Cabrera relies on the Delaware Supreme Court's decision in *State v. Cohen* for his contention that, during the penalty phase, evidence of previous crimes may be excluded as unduly prejudicial.[173] However, Cabrera misapplies the conclusions of *Cohen*, which addresses the relevance and prejudicial effect of "unadjudicated incidents"[174] while, in this case, Cabrera had already been convicted and sentenced for Otero's murder. Moreover, as the *Cohen* Court explained:

> Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question. Thus, even if the Court had ruled evidence of these unadjudicated incidents to be inadmissible during the guilt phase because their probative value was outweighed by the danger of unfair prejudice, that balancing becomes different in the penalty phase . . . . [Indeed], such incidents assume a *greater relevance* in a capital penalty hearing.[175]

Furthermore, the *Cohen* Court notes that, under the death penalty statute, "the jury and the judge must weigh the *totality of the circumstances*."[176]

Cabrera has not demonstrated that Cabrera Trial Counsel's representation fell below an objective standard of reasonableness with respect to the Otero murder presentation. Accordingly, Cabrera cannot satisfy the *Strickland* criteria.

---

[173] *See Cohen*, 634 A.2d at 385.
[174] *Id.* "[E]ven with the heightened relevance of this evidence in a penalty hearing, there remains concern about the unfair prejudice that may result from evidence about a crime *for which there has been no conviction*." *Id.* at 387–88, 392 (emphasis added).
[175] *Cohen*, 634 A.2d at 385 (internal citations omitted).
[176] *Id.* at 386 (emphasis added).

### 4. State's Punishment Theme in Closing

Cabrera argues that Cabrera Trial Counsel was ineffective for failing to object to the State's punishment theme during its closing. However, Cabrera Trial Counsel *did object* to the State's punishment theme, but counsel's objection was overruled by the Trial Court. During an office conference on February 13, 2001, Cabrera Trial Counsel argued that it was an "improper argument for sentencing that because [Cabrera] is already serving a life sentence that any[] [punishment] less than death . . . . [does] not satisfy society's goals."[177] The Trial Court concluded that the State could argue the fact that Cabrera was already serving a life sentence as a non-statutory aggravating factor for sentencing purposes.[178] Cabrera has not demonstrated that Cabrera Trial Counsel's representation fell below an objective standard of reasonableness since the objection was made but overruled by the Trial Court.

### VII. CABRERA TRIAL COUNSEL'S FAILURE TO SEEK SUPPRESSION OF THE GUN SEIZED FROM CABRERA SR.'S RESIDENCE WAS NOT INEFFECTIVE ASSISTANCE OF COUNSEL

Cabrera argues that Cabrera Trial Counsel was ineffective for failing to seek suppression of a .38 Special Armenius Titan Tiger gun ("38 Special Gun") because it was seized during a warrantless search during the unrelated Otero investigation. Cabrera's claim of ineffective assistance of counsel with respect to the decision by

---

[177] Office Conf. Tr. 2/13/2001 at 26:18–22.
[178] *Id.* at 28:2–4.

Cabrera Trial Counsel not to seek suppression of the 38 Special Gun seized from Cabrera Sr.'s residence will be addressed on the merits.[179]

On March 20, 1997, in connection with an investigation the murder of Funador Otero, police officers arrived at the home of Cabrera Sr. who signed a "Consent to Search Form;"[180] told the police there was a gun in the front bedroom; and led the police to the 38 Special Gun. Cabrera Sr. also told the police that Cabrera knew where Cabrera Sr. kept the 38 Special Gun and had access to it.[181] The police seized the 38 Special Gun.

Four days later, the State's Lead Investigating Officer Detective Mark Lemon ("State Lead Investigating Officer") sent the 38 Special Gun and bullet fragments from the Rockford Park Murders for testing. It was determined that the 38 Special Gun matched the weapon that fired the bullet recovered from Rowe's body. State Lead Investigating Officer used the ballistics evidence to obtain a search warrant for Cabrera Sr.'s house ("Cabrera Sr. Search Warrant").[182]

---

[179] In 2008, Cabrera's Rule 61 Counsel filed a motion for leave to conduct discovery on three matters related to Cabrera's Rule 61 motion, including issues related to the seizure of the 38 Special Gun from Cabrera Sr.'s house. In August 2008, the Trial Court issued two decisions denying the motions. *See Cabrera Motion for Leave to Interview Jurors*, 984 A.2d 149 (Del. Super. 2008); *Cabrera Motion for Leave to Conduct Discovery*, 2008 WL 3853998 (Del. Super. Aug. 14, 2008).

[180] Consent to Search Form, Cabrera Ex. 6 at 0013A.

[181] *Cabrera Sentencing*, 2002 WL 484641, at *7 ("Mr. Cabrera, Sr. told the police his son knew [Cabrera Sr.] had a gun.").

[182] *See* State Lead Investigating Officer's Aff., Cabrera Ex. 16 at 0059–70. State Lead Investigating Officer's affidavit to obtain a search warrant provided:

Stephanie Cabrera testified that she married Cabrera in December 1994, and that the two lived together until October 1995 in an apartment ("Cabrera Marital Apartment") in an apartment building ("Apartment Building").[183] According to Stephanie's testimony, Cabrera remained in the Cabrera Marital Apartment with Reyes after Stephanie moved out. Stephanie testified that, at that time, Reyes had been living with Cabrera and Stephanie for a month or two. Stephanie Cabrera testified that Cabrera moved out of the Cabrera Marital Apartment in the fall of 1996 and into the basement of Cabrera Sr.'s home.[184]

The police executed the Cabrera Sr. Search Warrant on April 4, 1997. During the search the police seized personal property belonging to Cabrera, including belts and a bed sheet that were later admitted into evidence at the Rockford Park Trial. In closing arguments at the Rockford Park Trial, the State relied on Cabrera's knowledge of the 38 Special Gun's location, and Cabrera's ability to possess and control the 38 Special Gun to argue that Cabrera had access to the 38 Special Gun at the time of Vaughn's and Rowe's murders.[185]

---

> Your affiant can state that on 20 March [19]97, Wilmington Police Detectives responded to 302 N. Franklin Street, Wilmington[,] Delaware in regards to a homicide investigation, *unrelated to this mater* . . . . Mr. Cabrera [Sr.] further said that *the only people who had keys to his residence that could have access to the gun was his son, Luis Cabrera* and [Cabrera's] friend, Luis Reyes.

*Id.* at 0062.
[183] *Cabrera Direct Appeal*, 840 A.2d at 1261.
[184] *Id.* at 1261; *Cabrera Sentencing*, 2002 WL 484641, at *7.
[185] Closing Arg. Tr. 2/8/2001 at 17:18–19:1–16.

Cabrera Trial Counsel testified about the strategic decision not to seek suppression of the 38 Special Gun as follows:

> CABRERA RULE 61 COUNSEL: Do you [Cabrera Trial Counsel] recall considering whether or not to move to suppress the [38 Special G]un that had been seized from Mr. Cabrera [Sr.'s] residence?
>
> CABRERA TRIAL COUNSEL: I don't believe we did.
>
> CABRERA RULE 61 COUNSEL: Do you recall the reasons why? Let me back up. You don't recall considering it, or you did consider it and decided not to?
>
> CABRERA TRIAL COUNSEL: I know we did not file [a motion to suppress]. I believe we talked about it. And the issues were, one, it wasn't [Cabrera's] . . . [38 Special G]un [and Cabrera] was the one on trial. We . . . did not want to give any indication that we were stating that was his [38 Special G]un. *Our defense was it wasn't [Cabrera's 38 Special G]un.* [Cabrera] didn't have a [38 Special G]un, he had no access to it. Plus, my recollection is I'm not sure that [Cabrera] was actually living there, and, therefore, [Cabrera] may not have had standing. So it was basically we didn't think [Cabrera] had standing, *plus we didn't want to have to admit that it was [Cabrera's 38 Special G]un.*" [186]

Cabrera Trial Counsel also explained that it didn't matter whether or not Cabrera knew or did not know about the location of the 38 Special Gun because the defense theory was that Cabrera did not have a 38 Special Gun.[187]

The 38 Special Gun was seized with the consent of Cabrera Sr., the owner of the residence and the owner of the gun. The United States and Delaware

---

[186] Ev. Hr'g Tr. 10/23/2012 at 59:10–23–60:1–5 (emphasis added).
[187] *Id.* at 61:3–5. "It all depends on what your defense is. And if your defense is not guilty, I didn't do it, I didn't have a gun . . . you don't want to leave the door open to any other interpretation." *Id.* at 61:10–14.

Constitutions protect the right of persons to be secure from "unreasonable searches and seizures."[188] Searches and seizures are *per se* unreasonable, in the absences of exigent circumstances, unless authorized by a warrant supported by probable cause.[189] However, warrantless searches conducted pursuant to a valid consent, qualify as a recognized exception to the warrant requirement.[190] Consent to search is valid if given voluntarily and if the person giving consent has the authority to do so.[191] Here, Cabrera Sr. had the authority to consent to the search of his residence and did so. Indeed, Cabrera Sr. lead the police to his gun kept within his residence.

Cabrera Trial Counsel has articulated a reasonable trial strategy that was inconsistent with seeking suppression of the 38 Special Gun. Cabrera cannot satisfy the first prong of *Strickland* with respect to this claim.

## VIII. CABRERA IS NOT ENTITLED TO RELIEF IN CONNECTION WITH HIS CHALLENGES TO THE BELT EVIDENCE

On April 4, 1997, a search of Cabrera Sr.'s residence yielded multiple belts from the basement, where Cabrera resided from time to time. On January 9, 2001, the first day of jury selection for the Rockford Park Trial, the Medical Examiner for the State of Delaware ("Medical Examiner") conducted a comparison of the belts seized from Cabrera Sr.'s residence to the photographs of Rowe's upper torso

---

[188] U.S. Const. amend. IV; Del. Const. art. I, § 6.
[189] *Hanna v. State*, 591 A.2d 158, 162 (Del. 1991).
[190] *Schneckloth v. Bustamonte*, 412 U.S. 218, 221–22 (1973).
[191] *Id.* at 222.

pattern injuries. It was the opinion of the Medical Examiner that the distinct pattern on the buckle of one of the belts ("Patterned Belt Buckle") taken from the basement of Cabrera Sr.'s house could have caused the markings Rowe's upper torso.

At the lunch recess that same day, the State informed Cabrera Trial Counsel that the State intended seek the admission into evidence of the results of the Medical Examiner's belt-to-injuries comparison ("Patterned Belt Buckle-Injury Presentation"). The State formerly disclosed its proposed Patterned Belt Buckle-Injury Presentation by letter dated January 10, 2001:

> As a follow up to the State's discovery response dated July 5, 2000, the State offers the following . . . . It is anticipated that [Medical Examiner] will testify in a descriptive fashion about the injuries [sustained by Rowe] . . . . We do not anticipate soliciting opinions about the instrument of causation.
>
> As described to you orally on January 9th, [Medical Examiner] examined the metal tip belts from [Cabrera Sr.'s residence]. That examination was conducted on the morning on January 9th . . . . With respect to one of the belts, the patterns and measurements match [Rowe's] injuries . . . . That belt was consistent with the pattern injuries and accordingly could have caused [Rowe's] injuries. [Medical Examiner] will not testify that the belt did in fact cause the injuries.[192]

On January 17, 2001, during the Rockford Park Trial, Cabrera Trial Counsel moved to exclude the Patterned Belt Buckle-Injury Presentation on the grounds that the timeliness of the State's disclosure was a discovery violation, and that

---

[192] Letter from State to Cabrera Trial Counsel dated Jan. 10, 2001, Cabrera Ex. 34 at 0174.

there was no evidence to associate the Patterned Belt Buckle with Cabrera at the time of the Rockford Park Murders.[193] Cabrera Trial Counsel reminded the Trial Court that, in May 2000, after a third conference discussing discovery issues, Cabrera Trial Counsel made a detailed discovery request to determine all of the expert testimony the State would offer at the Rockford Park Trial. The Trial Court ruled that the Patterned Belt Buckle-Injury Presentation was inadmissible because the State could not link the Patterned Belt Buckle to Cabrera.[194]

One week later, the State proffered a witness, Mileka Mathis, to testify that Cabrera owned the Patterned Belt Buckle at the time of the Rockford Park Murders. The Trial Court reconsidered its prior ruling on the admissibility of the Patterned Belt Buckle-Injury Presentation and ruled that the Patterned Belt Buckle-Injury Presentation—including the Patterned Belt Buckle itself—was admissible if authenticated and if the State established a link between the Patterned Belt Buckle and the injuries sustained on Rowe's upper torso. The Trial Court then recessed the Rockford Park Trial for one week so that Cabrera Trial Counsel could attempt to locate someone who could serve as a witness to rebut the State's Patterned Belt Buckle-Injury Presentation and the testimony of Mathis.

By letter dated January 30, 2001, Cabrera Trial Counsel requested that the Trial Court require the evidence to be presented as follows:

---

[193] Cabrera Trial Counsel Mot. in Limine Tr. 1/17/2001 at 13:11–13, 18:2–9.
[194] *Id.* at 32:1–38:1–18.

60

In light of the [Trial] Court's ruling that the [Patterned Belt Buckle] and the photographic overlays are admissible, we spoke with a photographer and [defense expert witness] Dr. Hameli. In addition, [Cabrera Trial Counsel] performed some research and concluded that the photographic array (in and of itself) was "scientific" in nature and, therefore, needed to qualify under the Delaware Supreme Courts acceptance of the holdings in *Daubert* . . . . In last Friday's office conference, [Cabrera Trial Counsel] intimated that a motion would be filed regarding the admissibility of the [Patterned Belt Buckle-Injury Comparison] evidence. Obviously, no issue had been presented to the [Trial] Court and, therefore, the [Trial] Court was not asked to rule on any particular issue. Nevertheless, the [Trial] Court did hypothesize that [Medical Examiner]'s testimony may be necessary in order to establish the basis for admission under *Daubert*.

After having reviewed the proffered evidence with Dr. Hameli, [Cabrera Trial Counsel] feel[s] duty bound to advise the [Trial] Court that the methodology employed by the Medical Examiner's Office is, in fact, a readily accepted practice in the field of forensic pathology . . . . [Cabrera Trial Counsel] believe[s] that, without [Medical Examiner]'s explanations, the jury would be left with an incomplete picture of the value of the testimony. *More directly,* [Cabrera Trial Counsel] believe[s] that, absent expert analysis, the photographic overlay would be simply misleading to the jury and would leave room for inappropriate speculation.

All this being said, the defense *does not* waive its objection to the admissibility of the [Patterned Belt Buckle-Injury Presentation] but, rather, seeks the most appropriate manner for the presentation of the evidence . . . . The State has been advised of [Cabrera]'s *continuing objection to the admissibility of the [Patterned Belt Buckle-Injury Presentation]*, as well as [Cabrera]'s proposed presentation of the evidence.[195]

The Patterned Belt Buckle-Injury Presentation was made at the Rockford

Park Trial, according to the parameters requested by Cabrera Trial Counsel,

---

[195] Letter from Cabrera Trial Counsel to the Trial Court dated Jan. 30, 2001, Cabrera Ex. 43 at 0208–09 (emphasis added).

including presentation by Cabrera's expert witness, Dr. Hameli, who testified contrary to Medical Examiner's Patterned Belt Buckle-Injury Presentation. Dr. Hameli testified that Medical Examiner's belt comparison was difficult because the Patterned Belt Buckle was three-dimensional while the photo overlays were two-dimensional.[196] Dr. Hameli also testified that there was just as many inconsistencies as consistencies between the Patterned Belt Buckle and the photo overlays and discussed the inconsistencies in detail.[197]

## A. Challenge to the State's Patterned Belt Buckle-Injury Presentation as a Discovery Violation

On direct appeal, the Delaware Supreme Court considered Cabrera's claim that the State violated its discovery obligations with respect to its Patterned Belt Buckle-Injury Presentation. The Supreme Court concluded that, although the State did violate discovery rules by failing to produce the Patterned Belt Buckle-Injury Presentation in a timely manner, the Trial Court properly exercised its broad discretion to fashion a remedy for the State's discovery violation.[198] The Delaware Supreme Court also concluded that Cabrera did not suffer prejudice from the State's discovery violation; Cabrera Trial Counsel presented an expert rebuttal witness; the State authenticated the Patterned Belt Buckle; and because the police

---

[196] Trial Tr. 2/7/2001 at 70:6–15.
[197] *Id.* at 73:16–80:1–15.
[198] *Cabrera Direct Appeal*, 840 A.2d at 1259, 1263 (concluding that the Trial Court did not abuse its discretion is admitting into evidence the Patterned Belt Buckle-Injury Presentation).

seized the Patterned Belt Buckle from the basement of Cabrera Sr.'s home among Cabrera's personal effects, it was linked to Cabrera with or without the testimony of Mathis.[199]

Therefore, Cabrera's claim is merely a renewal of a formerly adjudicated claim and is procedurally barred under Rule 61(i)(4). Cabrera's Rule 61 motion lacks any new legal or factual information that warrants reconsideration in the interest of justice.

## B. Challenge to the Delayed Disclosure of Mathis as a Witness

Cabrera argues that the State's delayed disclosure of Mathis as a witness resulted in a fundamentally unfair trial and that the Trial Court's grant of a one-week recess in the middle of the Rockford Park Trial did not alleviate the prejudice. Cabrera asserts that the delayed disclosure of Mathis was particularly prejudicial because it occurred at the end of the State's case-in-chief, after Cabrera Trial Counsel had already formulated its defense strategy. Cabrera maintains that if the State had disclosed the Patterned Belt Buckle-Injury Presentation and Mathis at the time the Trial Court ordered disclosure, then Cabrera Trial Counsel could have formulated a defense strategy that took the entirety of the State's Patterned Belt Buckle-Injury Presentation and Mathis testimony into consideration.

---

[199] *Id.* at 1263–65.

Cabrera's claim is merely a renewal of a formerly adjudicated claim and is procedurally barred under Rule 61(i)(4). Cabrera's Rule 61 motion lacks any new legal or factual information that warrants reconsideration in the interest of justice.

## C. Associated Claims of Ineffective Assistance of Counsel

Cabrera cannot demonstrate ineffective assistance of counsel with respect to this claim. Cabrera Trial Counsel presented specific, repeated objections to each aspect of the State's Patterned Belt Buckle-Injury Presentation throughout the Rockford Park Trial and upon direct appeal.[200] Accordingly, Cabrera Trial Counsel's representation with respect to its objections did not fall below a standard of reasonableness.

Also, contrary to Cabrera's claim, Cabrera Trial Counsel was not ineffective for failing to file a *Daubert* motion challenging the scientific method behind the Medical Examiner's Patterned Belt Buckle-Injury Presentation by photographic overlay. In fact, Cabrera Trial Counsel made a strategic decision not to request a *Daubert* hearing. Cabrera Trial Counsel's strategic decision not to file a *Daubert* motion offered the full-picture of the State's Patterned Belt Buckle-Injury Presentation to the jury, including the inconsistencies behind the methodology of

---

[200] *See* Cabrera Trial Counsel Mot. in Limine Tr. 1/17/2001 at 13:11–13, 18:2–9; Trial Tr. 1/24/2001 at 28:19–31:1–4, 42:2–14 (objecting to the State's late disclosure of its Patterned Belt Buckle-Injury Presentation); Letter from Cabrera Trial Counsel to the Trial Court dated Jan. 30, 2001, Cabrera Ex. 43 at 0208–09 (explaining that Cabrera Trial Counsel still objected to the admissibility of the State's Patterned Belt Buckle-Injury Presentation); *Cabrera Direct Appeal*, 840 A.2d at 1262 (noting that Cabrera renewed his objections to the State's Patterned Belt Buckle-Injury Presentation on direct appeal).

the State's Patterned Belt Buckle-Injury Presentation, while also avoiding speculation by the jury. Cabrera Trial Counsel's strategy to rebut the State's Patterned Belt Buckle-Injury Presentation did not fall below an objective standard of reasonableness. Accordingly, Cabrera cannot satisfy the first prong of *Strickland*.

Prior to the Rockford Park Trial, the State presented State witness Mathis with a belt line-up, which included the Patterned Belt Buckle. With respect to the belt line-up, Cabrera claims ineffective assistance of counsel for failing to object to this evidence. However, decisional law does not support the evidentiary challenge, which Cabrera now claims that Cabrera Trial Counsel should have presented. Accordingly, Cabrera Trial Counsel had no obligation to object to the State's use of a belt lineup including the Patterned Belt Buckle because there is no law applying the principles of "pre-trial identifications of suspects" to "pre-trial identifications of inanimate objects."[201] The first prong of *Strickland* is not met. Moreover, even if Cabrera Trial Counsel acted unreasonably with respect to the

---

[201] *See Hughes v. State*, 735 So. 2d 238, 261 (Miss. 1999) (concluding that "a line-up of inanimate objects is not subject to the same constitutional restrictions which burden eyewitness identifications of criminal defendants."); *Johnson v. Sublett*, 63 F.3d 926, 932 (9th Cir. 1995) ("There is no authority holding that a defendant's due process right to reliable identification procedures extends beyond normal authenticity and identification procedures for physical evidence offered by the prosecution."); *Com. v. Simmons*, 417 N.E.2d 1193, 1195 (Mass. 1981) ("No court to our knowledge has applied principles to pretrial identifications of suspects to pretrial identifications of inanimate objects.").

Patterned Belt Buckle-Injury Presentation, Cabrera cannot show that he suffered prejudice as a result.

Therefore, Cabrera's postconviction claim that the State's late disclosure of the Patterned Belt Buckle-Injury Presentation violated Cabrera's right to a fair trial is procedurally barred and Cabrera's accompanying claims of ineffective assistance of counsel are without merit.

## D. Claims Related to State's Witness Mathis

A variety of Cabrera's postconviction claims relate to Mathis as a State's witness. At the Rockford Park Trial, Mathis was called by the State as a witness and testified that she met Cabrera around 1994. Mathis was hesitant but stated that she and Cabrera had a sexual relationship "[s]poradically over . . . a year or two."[202] Mathis admitted that she was familiar with the clothing Cabrera wore, generally. The State showed Mathis the Patterned Belt Buckle and asked "can you tell us what - - whether or not you have ever seen that type of belt before?"[203] Mathis confirmed that that she had seen that type of belt before and, after additional questioning, Mathis testified that the Patterned Belt Buckle "stood out . . . . as something [Cabrera] would have worn back in the day, back then."[204]

---

[202] Trial Tr. 1/31/2001 at 32:19–20.
[203] *Id.* at 35:5–7.
[204] *Id.* at 35:7–36:1–9.

At that point, the Trial Court called a sidebar conference to discuss the Trial Court's observations regarding Mathis' reluctance to testify.[205] In response, the State explained, "I think the problem here, Your Honor . . . [Mathis] believes she is the mother of one of Luis Cabrera's children. She also learned after the fact that she is the daughter of . . . Rowe's father. The dynamics make it very difficult for her here."[206] According to the State, Mathis learned this information after the Rockford Park Murders.

Cabrera Trial Counsel began cross-examination. Mathis testified that State Lead Investigating Officer contacted her seven or eight times by phone and two or three times in person over the previous three to four weeks. According to Mathis, approximately two weeks before trial began, State Lead Investigating Officer showed Mathis a lineup of belts seized from the basement of Cabrera Sr.'s home. Mathis testified that at least one belt was the style Cabrera could have worn but she could not be sure if Cabrera actually wore, or even owned, the belt in question at the time of the Rockford Park Murders.

Cabrera was convicted on February 11, 2001. Thereafter, sometime in the summer of 2001, Mathis and Cabrera began writing each other letters. In fact,

---

[205] *Id.* at 38:1–5. The Trial Court explained, "It is [the Trial Court's] observation and it is reasonably obvious to [the Trial Court] that this young lady does not wish to be in this courtroom testifying in this case." *Id.* at 6–8.

[206] *Id.* at 39:7–13.

Mathis wrote Cabrera nearly twenty (20) letters in just over one month.[207] In the meantime, in or about August 2001, Mathis began calling Cabrera Trial Counsel's office. After weeks of missed calls, on September 4, 2001, Mathis informed Cabrera Trial Counsel that her testimony at the Rockford Park Trial was false, that State Lead Investigating Officer encouraged her to testify falsely, and that now she was trying to make things right.[208] Mathis met with Cabrera Trial Counsel on September 17, 2001 and September 25, 2001. Both interviews took place in the presence of Defense Investigator.

The September 17 interview was recorded and transcribed and is part of the postconviction record. Mathis discussed certain letters she wrote to Cabrera. Specifically, Mathis explained that she wrote Cabrera an apology letter for falsely testifying at the Rockford Park Trial. According to Mathis, State Lead Investigating Officer called Mathis one evening to discuss Cabrera's case and encouraged Mathis to testify untruthfully. According to Mathis, State Lead Investigating Officer suggested that he was aware Cabrera fathered one of Mathis' children and other details of Mathis' personal life, which information State Lead Investigating Officer then used to solicit specific testimony from Mathis. For instance, Mathis said State Lead Investigating Officer knew about her relationship to Rowe and suggested that testimony against Cabrera could help bring closure to

---

[207] *See Cabrera Motion for New Trial*, 2003 WL 25763727, at *12.
[208] *See* Aff. of John P. Deckers, Cabrera Ex. 68 at 0304–05.

the Rowe family. Mathis explained that State Lead Investigating Officer also knew that Mathis' brother was serving a life sentence in Florida and that it was difficult for the Mathis family to visit her brother. According to Mathis, State Lead Investigating Officer suggested that State Lead Investigating Officer could get Mathis' brother transferred to Delaware. Mathis also described the visit to her home by State Lead Investigating Officer when he showed her belts seized from Cabrera Sr.'s house.

On September 25, Mathis returned for a second interview. Mathis declined to have the September 25 interview taped or transcribed. However, Defense Investigator promptly summarized Mathis' statements at the conclusion of the interview. Defense Investigator's notes are part of the postconviction record. According to Defense Investigator's summary, Mathis repeated that she testified during the Rockford Park Trial at State Lead Investigating Officer's urging. Mathis stated that she knew State Lead Investigating Officer one to two years before Cabrera's arrest. She described a several-year periodic sexual relationship she had with State Lead Investigating Officer because she wanted "a cop as an ally." Mathis also said that she had sexual relationships with other officers introduced to her by State Lead Investigating Officer.

As a result of the information gleaned from the interviews with Mathis, Cabrera Trial Counsel filed a motion for a new trial in July 2002. As a result, the

Delaware Supreme Court stayed Cabrera's direct appeal pending the resolution of the motion. On December 19, 2002, the Court held a hearing on Cabrera's motion for a new trial. Both Mathis and State Lead Investigating Officer appeared but only State Lead Investigating Officer testified.

State Lead Investigating Officer denied knowing Mathis had a brother imprisoned in Florida and denied offering to have Mathis' imprisoned brother transferred to Delaware. State Lead Investigating Officer also denied ever having sex with Mathis or suggesting that Mathis have sex with any of his friends.

Mathis refused to testify at the hearing. Instead, Mathis invoked her right to remain silent on the advice of counsel. Cabrera Trial Counsel argued that the trial court should nonetheless admit Mathis' statements from the September 17 and September 25 interviews into evidence under an exception to the hearsay rule. On April 3, 2003, the Trial Court issued a decision detailing why Mathis' recantation statements were inadmissible as hearsay and denying Cabrera's motion for a new trial.[209] On direct appeal, the Delaware Supreme Court agreed that Mathis' statements were inadmissible hearsay and that Mathis' out-of-court-statements lacked corroboration or sufficient "circumstantial guarantees of trustworthiness."[210]

---

[209] *Cabrera Motion for New Trial*, 2003 WL 25763727 (Del. Super. Apr. 3, 2003).
[210] *Cabrera Direct Appeal*, 840 A.2d at 1267–68.

In anticipation of a postconviction evidentiary hearing, Mathis signed a sworn affidavit ("Mathis' 2012 Affidavit"),[211] detailing her relationship with State Lead Investigating Officer and confirming that State Lead Investigating Officer coached her Rockford Park Trial testimony. Cabrera Rule 61 Counsel asked the State if it would agree to the admissibility of Mathis' 2012 Affidavit and, if not, Cabrera Rule Counsel expressed its intent to seek an out-of-state deposition of Mathis. The State did not respond to Cabrera Rule 61 Counsel. Instead, on October 8, 2012, Cabrera Trial Counsel filed a motion to preclude Cabrera from presenting any further evidence concerning Mathis. The Court granted the State's motion.[212]

### 1. Claims Related to Whether Mathis Should Have Been Granted Immunity by the State in Connection with the Postconviction Challenge to Her Testimony

Cabrera argues that his constitutional rights to compulsory process and due process were violated because the State did not give Mathis immunity to testify during the evidentiary hearing on Cabrera's motion for a new trial. According to Cabrera, it is a criminal defendant's right to subpoena a witness and present that witness in his defense. Cabrera argues that the State substantially interfered with this right because it made thinly veiled threats to prosecute Mathis for perjury to

---

[211] Mathis' 2012 Aff., Cabrera Ex. 76 at 0685–0691.
[212] *See* Ev. Hr'g Tr. 10/9/2012 at 106:20–21; Ev. Hr'g Tr. 10/10/2012 at 3:14–15 ("I don't see any reason for any evidence.").

induce Mathis into invoking her privilege against self-incrimination. In support of this claim, Cabrera relies upon Mathis' 2012 Affidavit in which Mathis states, "If I had been given immunity, I would have recanted my [Rockford Park T]rial testimony."[213]

Cabrera's immunity claim is not subject to Rule 61(i)(4). On direct appeal, the Supreme Court considered whether the Trial Court properly ruled that Mathis' recantation statements were inadmissible, not whether the State should have granted Mathis immunity to testify regarding her statements. Accordingly, Cabrera's pending immunity-based postconviction claim was not formerly adjudicated and therefore, not barred by Rule 61(i)(4). On the other hand, Cabrera did not assert this immunity claim on direct appeal and, therefore, the immunity-based claim is subject to procedural considerations under Rule 61(i)(3). Accordingly, the Court shall consider the merits of Cabrera's constitutional claims and accompanying claims of ineffective assistance of counsel because ineffective claims are not subject to the procedural bar of Rule 61(i)(3).

Cabrera presents a constitutional challenge and two claims of ineffective assistance of counsel related to Cabrera's immunity claim. First, Cabrera asserts that Cabrera Trial Counsel's failure to argue that the State should grant Mathis immunity to testify in support of the motion for a new trial was ineffective

---

[213] *See* Mathis' 2012 Aff., Cabrera Ex. 76 at 0685, ¶ 2.

assistance of counsel. Second, Cabrera argues that Cabrera Trial Counsel failed to investigate corroborating evidence for Mathis' out-of-court statements that her Rockford Park Trial testimony was false and that State Lead Investigating Officer had coached her testimony.

Cabrera cannot establish that he was deprived of a "substantial constitutional right [and therefore] entitled to any [postconviction] relief."[214] As part of his constitutional claim, Cabrera cites persuasive authority standing for the proposition that "the State may not use threats or intimidating tactics that substantially interfere with a witness's decision to testify for a defendant."[215] First, a review of the record suggests Mathis invoked her privilege against self-incrimination at the advice of counsel and not in response to any threats of prosecution for perjury from the State. Second, because the Trial Court determined that Mathis' Rockford Park Trial testimony was true and her recantation statements were false, Cabrera is unable to satisfy his burden of showing Mathis' trial testimony was false in order to justify a new trial. For the aforementioned reasons, Cabrera's claim that his constitutional rights to compulsory process and due process were violated because the State did not give Mathis immunity to testify is rejected by this Court.

---

[214] *Younger*, 580 A.2d at 555.
[215] *State v. Feaster*, 877 A.2d 229, 245 (N.J. 2005).

73

**2. Ineffective Assistance Claims Related to Mathis in Connection with the Postconviction Challenge to Her Testimony at Rockford Park Trial**

Cabrera argues that Cabrera Trial Counsel was ineffective for failing to investigate Mathis, or question her during *voir dire*, before she testified at the Rockford Park Trial. According to Cabrera, in failing to investigate Mathis, Cabrera Trial Counsel failed to learn that, notwithstanding her testimony, Mathis did not have a long-term relationship with Cabrera; she could not identify the type of clothing Cabrera wore at the time of the Rockford Park Murders; and she was engaged in a long-term sexual relationship with State Lead Investigating Officer.

However, Cabrera Trial Counsel did investigate Mathis. In fact, Cabrera Trial Counsel's investigator, Defense Investigator, interviewed Mathis on January 23, 2001. Defense Investigator's report on the interview provides:

> MILEKA MATHIS interview provides her relationship with CABRERA and main police interest regarding belt buckles. She can't ID any particular belt. CABRERA is father of one of her children. [CABRERA] doesn't know this. She is to meet with AG's office this afternoon for interview. She was Rowe's brother but never knew him. She offers nothing regarding seeing ROWE or SAUNDERS prior to their disappearance. Also, nothing said to her by CABRERA re: the murders.[216]

Cabrera's postconviction claim relies on hindsight and unauthenticated, alleged recantation statements by Mathis. Cabrera's argument assumes that,

---

[216] Defense Investigator's Report to Cabrera Trial Counsel (Jan. 23, 2001), Cabrera Ex. 39 at 0195. *See also* Defense Investigator's Report to Cabrera Trial Counsel (Jan. 23, 2001), Cabrera Ex. 40 at 0196–97.

because Mathis did not offer Defense Investigator or Cabrera Trial Counsel the information she now asserts years after Cabrera's conviction, it can only mean that Cabrera Trial Counsel failed to investigate her properly. Cabrera's claim ignores the fact that Cabrera Counsel *did* interview Mathis. This Court cannot and will not find that Cabrera Trial Counsel acted objectively unreasonably because Mathis responded to their interview questions in a manner consistent with Mathis' Rockford Park Trial testimony but inconsistent with her unreliable and inadmissible recantation statements. Cabrera cannot satisfy the *Strickland* test.

Cabrera argues that Cabrera Trial Counsel was ineffective for failing to object to, or seek to strike, Mathis' Rockford Park Trial testimony–and the State's Patterned Belt Buckle-Injury Presentation subsequently admitted–based on the speculative nature of her testimony. Cabrera argues that Mathis only testified that the Patterned Belt Buckle presented at the Rockford Park Trial was the type of belt Cabrera would wear and not that Cabrera actually owned the Patterned Belt Buckle at the time of the Rockford Park Murders.[217] Cabrera's claim does not satisfy *Strickland* because even if Cabrera Trial Counsel should have objected to the speculative nature of Mathis' testimony, Cabrera cannot show that he suffered prejudice as a result of Cabrera Trial Counsel's failure to object. As the Delaware Supreme Court explained on direct appeal, "Mathis' trial testimony was weak and

---

[217] *See* Trial Tr. 1/31/2001 at 46:2–7, 47:2–5.

75

related to only one small link among several implicating Cabrera in the crime[,]"[218]

and more importantly:

> [P]olice had seized the belt from among Cabrera's personal effects at Cabrera's father's residence, where Cabrera was living at the time of the seizure. The required nexus may be established by circumstantial evidence. Seizure of the belt from among Cabrera's personal effects sufficiently demonstrated a connection between Cabrera and the belt.[219]

Therefore, regardless of Cabrera Trial Counsel's lack of direct objection to the nature of Mathis' testimony, the State presented enough circumstantial evidence to link Cabrera to the Patterned Belt Buckle. Cabrera cannot satisfy the two prongs of *Strickland*.

### 3. Ineffective Assistance Claims Related to Mathis in Connection with the Postconviction Challenge to Her Testimony at the Postconviction Hearing

Cabrera argues that Cabrera Trial Counsel was ineffective for failing to argue that Mathis' out-of-court statements were not hearsay because they were not being offered for the truth. Rather, Cabrera contends Mathis' out-of-court statements were prior inconsistent statements being offered to impeach her credibility. Cabrera's argument attempts to avoid the fact that Mathis made out-of-court statements *after* the Rockford Park Trial and post-trial statements, by definition, are not *prior* statements. Cabrera contends that this Court should

---

[218] *Cabrera Direct Appeal*, 840 A.2d at 1268.
[219] *Id.* at 1264.

nonetheless consider Mathis' post-trial statements as prior statements because "Mathis' statements *preceded* her *expected* testimony at the evidentiary hearing on Mr. Cabrera's motion for a new trial."[220] Cabrera offers no supporting law in support of his contention that Cabrera Trial Counsel's conduct was objectively unreasonable.

Cabrera argues that Cabrera Trial Counsel was ineffective for failing to argue the admissibility of Mathis' out-of-court statements under 11 *Del. C.* § 3507. Section 3507(a) provides, "In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value." However, § 3507 was not applicable in this case because Mathis was not subject to cross-examination. As the Delaware Supreme Court explained on direct appeal, "Mathis became unavailable to testify when she invoked her Fifth Amendment privilege at the evidentiary hearing."[221]

The record reflects that Cabrera Trial Counsel tried to corroborate Mathis' recantation statements. In its affidavit, Cabrera Trial Counsel stated it "ma[de] efforts to corroborate Ms. Mathis' various statements – not only the [Patterned Belt Buckle] claim, but all aspects of her statement."[222] Cabrera Trial Counsel stated

---

[220] Cabrera's Reply 84 (Oct. 3, 2014) (emphasis added).
[221] *Cabrera Direct Appeal*, 840 A.2d at 1267.
[222] Cabrera Trial Counsel Aff. ¶ 16.

77

that they were unsuccessful in their attempts to corroborate Mathis' recantation statements because Mathis persistently blocked access to persons who might have corroborated her out-of-court statements.[223]  Cabrera Trial Counsel explained that Mathis' actions led it to believe Mathis' statements "were curiously suspect."[224]

Cabrera cannot satisfy the *Strickland* test for either of the two ineffective assistance of counsel claims related to Mathis.  Cabrera's argument focuses on the prejudicial effect of Mathis' failure to testify at the evidentiary hearing rather than showing Cabrera Trial Counsel acted unreasonably.  Failure to prove either prong of *Strickland* will render the claim unsuccessful. While Mathis' testimony may have been prejudicial, Cabrera cannot demonstrate that the result of the proceeding would have been different if she had not testified. Moreover, Cabrera Trial Counsel cannot demonstrate that the performance of Cabrera Trial Counsel fell below an objective standard of reasonableness.  Accordingly, Cabrera has not met the *Strickland* standard to demonstrate his claims of ineffective assistance of counsel with respect to Mathis.

### 4. Claims Related to Alleged Overreaching by State Lead Investigating Officer with Respect to Rockford Park Trial Testimony by Mathis

First, Cabrera asks this Court to reconsider the Trial Court's decision to preclude the introduction of evidence concerning Mathis and her Rockford Park

---

[223] *Id.*
[224] *Id.*

Trial testimony because Cabrera's claims—as they relate to State Lead Investigating Officer and perjured testimony—were not litigated previously and lacked a developed factual record. Cabrera relies upon Mathis' statements during the September 17 and September 25 interviews, and Mathis' 2012 Affidavit in support of his contentions that State Lead Investigating Officer coached Mathis to lie under oath and that the State knowingly used perjured testimony. Second, upon consideration of Mathis' 2012 Affidavit, Cabrera asks that his conviction overturned because his conviction is the result of perjured evidence and, therefore, must be set aside because there is a reasonable likelihood that the perjured testimony could have affected the judgment.

In opposition, the State reiterates its position that Cabrera's claim that Mathis gave coerced testimony has been adjudicated and is therefore procedurally barred under Rule 61(i)(4). In addition, the State argues that Cabrera's claim that the State knowingly used perjured testimony claim is barred under Rule 61(i)(3) because it was not raised on direct appeal.

First, this Court will not reconsider the Trial Court's decision to preclude the introduction of evidence relating to Mathis and her Rockford Park Trial testimony. This Court is satisfied that the Mathis issues have been adjudicated in connection with Cabrera's motion for a new trial and on direct appeal with the Delaware Supreme Court. As discussed above, at the December 19, 2002 evidentiary

hearing on Cabrera's motion for a new trial, Mathis invoked her rights under the Fifth Amendment when asked if she testified truthfully at the Rockford Park Trial. However, State Lead Investigating Officer testified at the hearing and denied all of Mathis' statements. Then, on direct appeal, the Delaware Supreme Court specifically agreed with the Trial Court's determination that Mathis' out-of-court statements lacked corroboration and sufficient "circumstantial guarantees of trustworthiness."[225]

Furthermore, Cabrera offers no new factual or legal developments to warrant this Court's reconsideration. Despite the fact that it was not proffered until 2012, Mathis' 2012 Affidavit fails to qualify as a new factual for purposes of the interests of justice exception because it offers information available—and in fact presented—during earlier proceedings.[226] As the Supreme Court aptly stated in its 2004 decision, "excluding the [Mathis] evidence does not pose a great risk of miscarriage of justice, because Mathis' [Rockford Park T]rial testimony was weak *and related to only one small link among several implicating Cabrera in the crime*."[227] Accordingly, Cabrera's request that this Court reconsider its decision to

---

[225] *Cabrera Direct Appeal*, 840 A.2d at 1267–68 (noting the lack of corroborating circumstances to support the truthfulness of Mathis' statements and that nothing in the record indicated that Mathis' testimony was coerced or coached).

[226] *See id.* at 1267–68; *Flamer*, 585 A.2d at 745–46. *Cf. Weedon v. State*, 750 A.2d 521, 527–29 (Del. 2000).

[227] *Cabrera Direct Appeal*, 840 A.2d at 1268 (emphasis added).

preclude the introduction of evidence concerning Mathis and her Rockford Park Trial testimony is hereby denied.

Second, Cabrera cannot demonstrate that his conviction is based on testimony the State knew was perjured and, therefore, Cabrera's associated claim that his conviction should be overturned as a result fails. Not only is this claim subject to procedural default under Rule 61(i)(3) because it was not raised on direct appeal, but as the Delaware Supreme Court stated:

> In order to meet the first prong, Cabrera had to show that Mathis' trial testimony was false. The trial judge ruled that Cabrera failed to carry this burden because the hearsay statements were inadmissible and *the other evidence at the hearing suggested that it was Mathis' recantation, and not her trial testimony, that was false*.[228]

Under these circumstances, and recognizing the limited role of Mathis' testimony at the Rockford Park Trial, Cabrera's claim that State Lead Investigating Officer suborned perjured testimony is procedurally barred under Rule 61(i)(3) and is hereby denied.

## IX. CABRERA'S POSTCONVICTION CLAIMS CHALLENGING JURORS ARE PROCEDURALLY BARRED

### A. Challenge to Death Qualification of Jurors is Procedurally Barred by Rule 61(i)(3) and There was No Miscarriage of Justice or Ineffective Assistance of Counsel

Cabrera argues that the State excused numerous qualified prospective jurors for cause based upon the juror's views on the death penalty in violation of

---

[228] *Id.* at 1266 (emphasis added).

Cabrera's constitutional right to trial by an impartial jury drawn from a fair cross-section of the community. Further, Cabrera maintains that the Trial Court's *voir dire* misrepresented the law, caused unnecessary confusion, and eliminated prospective jurors despite indications the juror could perform its juror duties properly.

Cabrera did not challenge the death qualification of jurors during the Rockford Park Trial or on direct appeal. Cabrera asserts that his failure to raise this issue at the Rockford Park Trial or on appeal is because Cabrera Trial Counsel was ineffective. Accordingly, the Court shall consider the merits of Cabrera's accompanying claim of ineffective assistance of counsel because ineffective claims are not subject to the procedural bar of Rule 61(i)(3).

Rule 61(i)(3) bars relief if the motion includes claims not asserted in prior proceedings leading to the final judgment. The procedural bars to postconviction relief under Rule 61(i)(3)[229] can be overcome if the motion asserts a colorable claim that there has been a "miscarriage of justice" as the result of a constitutional violation that undermined the fundamental fairness of the proceedings.[230] This Court is satisfied that there was no miscarriage of justice with respect to jury

---

[229] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(1) and (2), but those bars are not relevant here.
[230] Super. Ct. Crim. R. 61(i)(5); *Younger*, 580 A.2d at 555.

82

selection.  Moreover, Cabrera has not demonstrated that Cabrera Trial Counsel was ineffective with respect to jury selection.

Cabrera maintains that Cabrera Trial Counsel's failure to object to the *voir dire* and death qualification of the prospective jurors was ineffective assistance of counsel.  This claim does not satisfy *Strickland*.  First, Cabrera's claim merely concludes that Cabrera Trial Counsel acted objectively unreasonably for failing to raise these objections, which prejudiced Cabrera.  Indeed, this claim is conclusory.  Second, even if Cabrera Trial Counsel did act objectively unreasonably, Cabrera cannot demonstrate that he suffered actual prejudice.

Cabrera argues that striking qualified jurors in violation of the standards established in *Wainwright v. Witt*,[231] and *Witherspoon v. Illinois*,[232] constitutes reversible error requiring "the vacation of a death sentence imposed by a jury" from which the juror "has been erroneously excluded for cause."[233]  Cabrera contends that twenty-two (22) prospective jurors were excused for cause on the basis of the juror's view on the death penalty but at least eight (8) of these jurors unambiguously stated he or she could nonetheless follow the Trial Court's instructions and the juror's oath to find the facts impartially and decide the case according to the law.  The Court finds Cabrera's argument unpersuasive.  The

---

[231] 469 U.S. 412 (1985).
[232] 391 U.S. 510 (1968).
[233] *Gray v. Mississippi*, 481 U.S. 648, 659 (1987).

83

Delaware Supreme Court "has consistently upheld as constitutional the death qualification process in Delaware."[234] According to Delaware decisional law, "justice is not served by allowing persons to sit on a jury in a capital case who are unable to render an impartial verdict because of their opposition to the death penalty."[235] Even though the jury is not the final arbiters of punishment, it is contrary to law to allow a juror to sit as the conscience of the community despite personal views that would prevent the juror from impartially performing his or her responsibilities.[236]

Moreover, this Court rejects Cabrera's application of the controlling standard for qualifying a jury in a death penalty case. The Delaware Supreme Court addressed this issue under similar circumstances in *Gattis v. State*.[237] As the Supreme Court explained, "the standard is not whether, under any conceivable set of circumstances, the juror could never recommend the death sentence . . . . [but] whether the juror's views render the juror unable to comply with the trial court's

---

[234] *Hobbs v. State*, 538 A.2d 723, 725–26 (Del. 1988) (discussing the jury selection process under 11 *Del. C.* § 3301 and the State's interest in death qualifying jurors).

[235] *Gattis v. State*, 697 A.2d 1174, 1181 (Del. 1997).

[236] *State v. Cohen*, 604 A.2d 846, 855–56 (Del. 1992) ("Any personal views which would prevent [jury] members from impartially performing this solemn responsibility in accordance with the trial court's instructions are impermissible and contrary to law."). *See also Gattis*, 697 A.2d at 1181, 1182.

[237] *Gattis*, 697 A.2d at 1180–82 (discussing a "death-qualified" jury).

instructions and her oath."[238]  Upon review of the statements of the three jurors in question, the *Gattis* Court concluded:

> Each of the above three juror candidates expressed unambiguously that she would not be able to recommend a sentence of death in this case even if the facts and the law so allowed.  In our view, [the juror's] statements show that each would be unable to put aside personal feelings against the death penalty regardless of the evidence or in deference to the rule of law.[239]

Upon consideration of the record, this Court finds that the eight jurors who expressed opposition to the death penalty in question were properly excused for cause.  Therefore, this Court finds that Cabrera's constitutional claims and accompanying claim of ineffective assistance of counsel with respect to jury selection are procedurally barred without exception.

## B. Cabrera's Challenges to Three Seated Jurors Are Procedurally Barred by Rule 61(i)(4) and There was No Miscarriage of Justice or Ineffective Assistance of Counsel

Cabrera claims that his constitutional right to a verdict by an impartial jury was violated as a result of three separate juror-related issues that occurred during the Rockford Park Trial.  Cabrera claims the Trial Court: (1) failed to declare a mistrial-or dismiss Juror No. 8 who overheard someone say "I think [Cabrera's] guilty" during the first few days of the Rockford Park Trial; (2) improperly addressed Juror No. 9's indication that Cabrera's wife "looked familiar;" and (3)

---

[238] *Id.* at 1181.
[239] *Id.* at 1182.

failed to dismiss Juror No. 5 after she indicated potential mental or physical instability related to reaching a verdict in Cabrera's case.

The Trial Court specifically reviewed and rejected these claims in 2008 in connection with Cabrera's request to conduct *ex parte* interviews of the jurors on the premise that he was entitled to an impartial jury and a fair trial.[240]   In its decision denying Cabrera's motion to interview the jurors, the Trial Court discussed the conduct of Juror Nos. 5, 8, and 9 throughout the Rockford Park Trial, which prompted Cabrera to seek leave to interview all of the jurors.   The Trial Court discussed the Trial Court's actions at the time of the trial.   Furthermore, the Trial Court discussed the Rule of Professional Conduct that impeded Cabrera's ability to interview the jurors.   The Trial Court denied Cabrera's motion stating that while Delaware's Rules of Professional Conduct allowed for communication with jurors at the Trial Court's Ruling, such contact was inappropriate in this case.[241]

Accordingly, the Court finds these claims are procedurally barred pursuant under Rule 61(i)(4) because these claims have already been adjudicated.   Under Delaware decisional law, "[t]he determination of a juror's impartiality is the responsibility of the trial judge who has the opportunity to question the juror, observe his or her demeanor, and evaluate the ability of the juror to render a fair

---

[240] *Cabrera Motion for Leave to Interview Jurors*, 984 A.2d at 150.
[241] *Id.* at 161, 169–70.

verdict."[242] Rule 61(i)(4) bars relief if the motion includes grounds for relief formerly adjudicated in any proceeding leading to the judgment of conviction, in an appeal, or in a postconviction proceeding. The procedural bar under Rule 61(i)(4)[243] can be overcome if consideration of the claim on its merits is warranted in the "interest of justice." If the postconviction motion is procedurally barred and neither exception applies, the Court should dispose of the motion because postconviction relief is not "a substitute for direct appeal."[244]

Cabrera's Rule 61 motion offers no new legal or factual information that warrants reconsideration in the interest of justice. The presentation of these claims is merely a restatement of claims already presented to the Trial Court and adjudicated. Moreover, because Cabrera Trial Counsel did, in fact, raise these challenges at the appropriate time during trial or in the early stages of postconviction proceedings, counsel met the objective standard of reasonable performance.

## X. CABRERA'S CHALLENGES TO THE *ALLEN* CHARGE ARE PROCEDURALLY BARRED

Around 5:30 p.m. on February 10, 2001, less than two days after deliberations began, the jury foreman notified the Trial Court that the jury was in a

---

[242] *Weber v. State*, 547 A.2d 948, 954 (Del. 1988).

[243] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(2), but that bar is not relevant here.

[244] *Flamer*, 585 A.2d at 745.

state of deadlock. At 6:00 p.m. on the same day, the Trial Court instructed the jury to stop deliberations. At that time, the Trial Court provided the jury with an *Allen* charge, consistent with requests made by the State and Cabrera Trial Counsel. Following the *Allen* charge, the jury left the courtroom and resumed deliberations on the following morning. On February 11, 2001, at 12:45 p.m., the jury reached a verdict. The jury found Cabrera guilty of two counts of First Degree Murder, two counts of Conspiracy in the First Degree, and other offenses.

## A. Lack of Transition Language[245] in *Allen* Charge

Cabrera argues that the Trial Court's failure to include language in reference to lesser-included offenses in the *Allen* charge in its jury instructions and violated Cabrera's constitutional rights. This matter was addressed on the record during an office conference with the Trial Court, the State, and Cabrera Trial Counsel.[246] During the office conference, Cabrera Trial Counsel specifically expressed concern regarding the lack of transition language in the Trial Court's *Allen* charge. However, the Trial Court determined that, because its jury instructions already

---

[245] Transition language informs a jury—which has been instructed on lesser-included offenses—of the proper procedures under which that jury may consider the lesser-included offenses if, after reasonable efforts, the jury cannot agree on the greater offense charged. *See Smith v. State*, 660 A.2d 395 (Del. 1995) (TABLE). *See also Com. v. Hallman*, 67 A.3d 1256, 1263 (Pa. 2013) (referring to transition language as a "progression charge"); *State v. Labanowski*, 816 P.2d 26, 31 (Wash. 1991) (en banc) (explaining that "transition instructions" are also referred to as "retiring instructions" or a "progression charge").

[246] *See* Office Conf. Tr. 2/10/2001 at 19:16–30:1–2 (discussing the *Allen* charge).

included an instruction on accomplice liability, there was no need for additional transitional language during the *Allen* charge. Specifically, the Trial Court stated:

> [T]ransition language at this point is legally inapplicable and potentially confusing. Other than what has been stated in *Chance*, [that the jury] ha[s] to decide. If [the jury] can't decide [Cabrera] is not the principal, [then Cabrera] is an accomplice. [The jury] ha[s] to look at [Cabrera's] culpability, his mental culpability what degree it is.[247]

Cabrera's pending postconviction claim is merely an attempt to reargue an adjudicated matter and is therefore procedurally barred under Rule 61(i)(4). Cabrera's Rule 61 motion offers no new legal or factual information that warrants reconsideration in the interest of justice. Cabrera alleges an accompanying claim of ineffective assistance of counsel for failing to argue for transition language. However, consistent with prevailing professional norms, Cabrera Trial Counsel did request transition language but the Trial Court denied the request. Cabrera's claim is barred and no exception applies.

## B. Coerciveness of the *Allen* Charge

Cabrera contends that the *Allen* charge was unduly coercive and violated his right to a unanimous jury verdict in that the Trial Court instructed only jurors in the minority to reconsider their position and unduly discussed the economic burden involved in retrying the case. Cabrera asserts that such an instruction intimidated dissenting jurors and compromised his right to a unanimous jury verdict.

---

[247] *Id.* at 27:20–28:1–3.

Cabrera did not challenge the *Allen* charge during the Rockford Park Trial or on direct appeal. The claim is therefore procedurally barred by Rule 61(i)(3). This procedural bar can be overcome if there was a miscarriage of justice or by a successful challenge to the ineffective assistance of counsel.

This Court finds that there was no miscarriage of justice in instructing the jury to continue deliberations. The Trial Court instructions provided, "the [Trial] Court does not wish *any juror* to surrender his or her conscientious convictions . . . . each [juror] must decide the case for [them]selves . . . . [and r]emember, at all times no juror is expected to yield . . . his or her conscientious conviction . . . . [i]t is your duty to agree on a verdict *if you can do so without violating juror's individual judgment and conscious*."[248] Therefore, the *Allen* charge included language that diminished any potential coercive effect from the minority distinction alleged prejudicial by Cabrera.[249]

Also, Cabrera Trial Counsel's representation was well within prevailing professional norms. Cabrera Trial Counsel explained in connection with postconviction proceedings that their request for the *Allen* charge was an

---

[248] Trial Tr. 2/10/2001 at 32:16–23, 34:9–10 (emphasis added).

[249] *Id.* at 30:4–35:1–15 (reading of the *Allen* charge to the jury). *See Collins v. State*, 56 A.3d 1012, 1020 (Del. 2012) ("The potential coercive effect of an *Allen* charge 'can be eliminated by having the charge include an admonition that each individual juror not surrender his or her honest convictions and not return any verdict contrary to the dictates of personal conscience.'") (quoting *Brown v. State*, 369 A.2d 682, 684 (Del. 1976)).

appropriate tactical decision.[250] Cabrera Trial Counsel determined that Cabrera "had the best chance of success with this jury during this particular trial; Mr. Cabrera agreed with that assessment."[251]

In addition, Cabrera argues that Cabrera Trial Counsel improperly excluded Cabrera from the office conference discussing the jury deadlock and requesting the *Allen* charge in violation of his Superior Court Criminal Rule 43 right to be present. This claim does not satisfy *Strickland*. Pursuant to Rule 43(b)(3), the presence of a criminal defendant is not required during "a conference or argument upon a question of law." The wording of an *Allen* charge is indeed a question of law.[252] Cabrera Trial Counsel consulted Cabrera with respect to all significant trial decisions, including this decision. Cabrera Trial Counsel stated that it "never made any significant decision, tactical or otherwise, without consulting with Mr. Cabrera."[253] In addition to consultation with counsel, Cabrera was present when the Trial Court read the *Allen* charge to the jury.

Accordingly, Cabrera's postconviction claim that the *Allen* charge was unduly coercive and accompanying claims of ineffective assistance of counsel must be dismissed on procedural grounds. This Court is satisfied that Cabrera

---

[250] Cabrera Trial Counsel Aff. ¶ 13.
[251] *Id.*
[252] *See Bradshaw v. State*, 806 A.2d 131, 139 (Del. 2002). Indeed, the *Bradshaw* Court stated, "It is hard to believe that [the defendant's] presence, as distinct from that of his counsel, would have influenced the wording of the *Allen* charges." *Id.*
[253] Cabrera Trial Counsel Aff. ¶ 13.

Trial Counsel acted in accordance with the prevailing decisional law, made tactical decisions, and properly included and consulted Cabrera during the process. Finally, the interest of justice exception does not apply.

## XI. CABRERA IS NOT ENTITLED TO RELIEF IN CONNECTION WITH THE STATE'S COMMENTS ON CABRERA'S ALLOCUTION

Cabrera argues that the Trial Court violated his constitutional rights by failing to grant a mistrial when the State commented to the jury on Cabrera's failure to express remorse during his allocution.[254] Cabrera unsuccessfully presented this argument on direct appeal and, therefore, the argument is procedurally barred under Rule 61(i)(4). On direct appeal, the Supreme Court applied the test articulated in *Lesko v. Lehman*,[255] to determine whether the State had improperly commented on a defendant's right to remain silent and concluded that the State had not improperly commented on Cabrera's allocution.[256] Indeed, the Supreme Court found that the State "essentially repeated verbatim what Cabrera had said during allocution."[257]

---

[254] Allocution is the formal court inquiry of defendant to ask whether he has any legal cause to show why judgment should not be pronounced against him; or, whether he would like to make a statement on his behalf and present any information in mitigation of sentence. *Black's Law Dictionary* 76 (6th ed. 1990).
[255] 925 F.2d 1527 (3d Cir. 1991).
[256] *Cabrera Direct Appeal*, 840 A.2d at 1271–72.
[257] *Id.* at 1271.

Cabrera now argues that the Supreme Court improperly relied on the Court's own decision in *Shelton v. State*,[258] to find that the State's comments did not violate Cabrera's rights. However, while the Supreme Court did discuss the *Shelton* case, the Court also specifically contrasted the circumstances in *Shelton* to the circumstances of Cabrera's allocution.[259] The Supreme Court stated that, "[i]n *Shelton*, by contrast, the [State] specifically stated that the defendant had failed to show any remorse."[260] The Supreme Court noted a similarity between the cases, concluding, "[A]s in *Shelton*, the [State]'s comments, to the extent they touched on Cabrera's lack of remorse at all, did so very briefly."[261]

Accordingly, Cabrera's claim is procedurally barred from consideration on the merits under Rule 61(i)(4). Cabrera's Rule 61 motion lacks any new information that warrants reconsideration on the merits in the interest of justice.

## XII. JUSTICE WAS SERVED IN THE GUILT PHASE OF CABRERA'S ROCKFORD PARK TRIAL

Pursuant to Rule 61(i)(5), procedural bars to postconviction claims are not applicable to a "colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."

---

[258] 744 A.2d 465 (Del. 1999).
[259] *Cabrera Direct Appeal*, 840 A.2d at 1271–72.
[260] *Id.* at 1271.
[261] *Id.* at 1272.

Moreover, pursuant to Rule 61(i)(4), the Court must address any postconviction claim that has been formerly adjudicated if "reconsideration is warranted in the interest of justice."

Not every constitutional violation merits relief under the "miscarriage of justice" exception.[262] A criminal defendant must present a colorable claim of a constitutional violation that "undermined the fundamental legality, reliability, integrity or fairness of the proceedings leading to the judgment of conviction."[263] A colorable claim requires the showing of "sufficient facts . . . to take the question past the frivolous state."[264] If Cabrera fails to assert a colorable claim, then this Court will deny the claims on procedural grounds. Moreover, a criminal defendant may trigger the interest of justice exception by presenting legal or factual developments that have emerged subsequent to the conviction.[265] The interest of justice exception is narrow in scope, however, to preserve the purpose of Rule 61(i) procedural bars: achieving finality of judgments.[266]

According to evidence presented during the Rockford Park Trial, Saunders and Rowe were found dead in a wooded area in Rockford Park. The bodies were discovered next to one another, face up, and covered by a burgundy-colored bed

---

[262] *Webster v. State*, 604 A.2d 1364, 1366 (Del. 1992).
[263] Super. Ct. Crim. R. 61(i)(5); *Webster*, 604 A.2d at 1366.
[264] *State v. Wharton*, 1991 WL 138417, at *7 (Del. Super. June 3, 1991).
[265] *Flamer*, 585 A.2d at 745–46; *Weedon*, 750 A.2d at 527–29 (discussing witness recantation as a factual development for purposes of the interest of justice exception).
[266] *State v. Rosa*, 1992 WL 302295, at *7 n. 10 (Del. Super. July 10, 1992).

sheet. The evidence presented against Cabrera in the Rockford Park Trial supported the jury's unanimous verdict of guilt beyond a reasonable doubt. In addition to the evidence addressed in connection with the discussion of Cabrera's Rule 61 claims, there was additional evidence for the jury to consider.

**A. Autopsy Reports**

The autopsies revealed gunshot wounds to the backs of Saunders and Rowe's heads. The autopsy suggested that the men had been beaten, shot, and dragged into the wooded area of the park where the bodies were eventually discovered.

Rowe's cause of death was determined to be a gunshot wound to the back of the head. Rowe's autopsy showed lacerations to the right eye and lower lip, and revealed bruises to the abdomen and rib cage, which were determined to have caused non-life threatening internal bleeding. The autopsy revealed what appeared to be drag marks on Rowe's lower-body. The drag marks were consistent with the theory that the men had been dragged into the wooded-area of Rockford Park. The Medical Examiner opined that Rowe suffered all non-gunshot injuries prior to the fatal gunshot.

Saunders' cause of death was determined to be a gunshot wound to the back of the head. Unlike Rowe, Saunders did not suffer any face, torso, or internal injuries. The Medical Examiner recovered a bullet from inside Saunders' brain.

95

**B. Ballistics Test**

A ballistics test of the 38 Special Gun resulted in evidence that the bullets fired from the 38 Special Gun matched the weapon that fired the bullet recovered from Rowe's body during the autopsy.

**C. Cabrera's Number in Memory Bank on Rowe's Wristwatch**

The police recovered an electronic wristwatch from Rowe's body, with a memory bank of phone numbers. A search of the memory bank recovered a phone number listed for the residence of Cabrera Sr.

**D. Rowe at Apartment Building Previously**

Clavel Clamamont lived on the third floor of the Apartment Building. During the Rockford Park Trial, Clamamont testified to knowing Cabrera as "Big Louie." Clamamont testified to knowing that Cabrera lived with Reyes, who was known as "Little Louie."[267] Clamamont testified that Cabrera and Reyes seemed very close to each other. Clamamont testified that he recognized Rowe from the autopsy photograph as someone she had previously seen outside of the Apartment Building.[268]

**E. Saunders had Business Card with Cabrera's Name and Number**

During a search of Saunders' home, police discovered a business card with "434-6154 Big Lou" handwritten on its back.

---

[267] *Cabrera Sentencing*, 2002 WL 484641, at *6.
[268] *Id.* at *6.

**F. Metal Shovel Belonged to Cabrera's Neighbor**

The police recovered a metal shovel at Rockford Park, near the bodies of Saunders and Rowe. Donna Ashwell, Cabrera's neighbor in the Apartment Building, testified that she owned the shovel, which she kept outside in a common area but that the shovel went missing around the time of the Rockford Park Murders.[269] In its closing arguments, the State told the jury:

> We know that someone tried to dig a grave. There is no contradiction about this testimony. Similarly, you should not allow your common sense to be contradicted on the point you can't dig a grave without a shovel. Donna Ashwell told us her shovel was missing. We don't know who tried to dig the grave, whether it was [Cabrera] or . . . [Reyes] or both of them at separate times. But we know that someone tried.[270]

**G. Saunders' Pager Sold by Cabrera**

Saunders owned a pager protected with a blue pager case. During an investigation on February 3, 1996, police found Saunders' pager for re-sale at a store in Wilmington, Delaware.[271] The store turned over a receipt of the pager-return transaction which bore Cabrera's signature. As a result, police turned its investigative focus to Cabrera.

---

[269] *Cabrera Direct Appeal*, 840 A.2d at 1261.
[270] Closing Arg. Tr. 2/8/2001 at 53:23–54:1–9.
[271] Police referenced a code on the inside of the pager and identified the pager as belonging to Saunders.

**H. Burgundy Bed Sheets Match**

In April 1997, during the search of Cabrera Sr.'s house, the police seized a burgundy-colored, fitted bed sheet in the basement, where Cabrera resided from time to time. The FBI compared the fitted bed sheet with the bed sheet found covering the bodies of Saunders and Rowe at Rockford Park. The comparison revealed that the sheets were the same color, made by the same manufacturer, and both had been sold at J.C. Penney. Stephanie Cabrera testified that she and Cabrera owned a similar set of burgundy-colored sheets and that, when she moved out of the Cabrera Marital Apartment, she left the sheets with Cabrera.

**I. Loud Voices on the Night of the Rockford Park Murders**

Donna Ashwell lived on the first floor of the Apartment Building. During the Rockford Park Trial, Ashwell testified that one Saturday evening in January 1996, she heard an argument in the shared basement of the Apartment Building sometime before 9:30 or 10:00 o'clock at night. Ashwell testified that she moved to the basement door to investigate after recognizing Cabrera's voice. Ashwell testified that she eventually overheard a loud crash. Ashwell saw Reyes and inquired about the noise coming from the basement. Reyes reportedly informed Ashwell "they would leave." Later that evening, Cabrera apologized to Ashwell for the noise.

Upon consideration of the entire record, this Court finds there was no miscarriage of justice pursuant to Rule 61(i)(5) and that reconsideration of otherwise procedurally barred claims is not warranted in the interest of justice pursuant to Rule 61(i)(4). The fundamental legality, reliability, integrity and fairness of the proceedings leading to Cabrera's conviction and sentencing are sound.

## XIII. CABRERA IS NOT ENTITLED TO RELIEF FOR *BRADY* VIOLATION(S)

Cabrera's Rule 61 motion argues that the State violated his constitutional rights by failing to disclose certain exculpatory evidence, including impeachment evidence concerning Keith Powell; exculpatory statements made by Sparkle Harrigan; and exculpatory information provided by Carlos Rodriguez concerning Omar Colon's alleged involvement in the Rockford Park Murders. Cabrera contends that the cumulative effect of these *Brady* violations undermine confidence in the outcome of the Rockford Park Trial. Cabrera is not entitled to a new trial on the grounds of cumulative *Brady* violations because, for the reasons that follow, Cabrera has not demonstrated the existence of even a single *Brady* violation.

### A. Keith Powell

During the Rockford Park Trial, Cabrera Trial Counsel presented Powell as a witness to contradict the State's timeline for the Rockford Park Murders of

99

Saunders and Rowe. On cross-examination, the State used Powell's prior inconsistent statements to the police to undermine his credibility as a witness. However, the State had not disclosed Powell's prior statements to Cabrera Trial Counsel.

On direct appeal, Cabrera argued, "the State's disclosure of Powell's exculpatory statements coupled with its withholding of information of Powell's inconsistent statements and other impeaching evidence, constituted a *Brady* violation that violated Cabrera's due process rights."[272] The Delaware Supreme Court determined that Powell's direct testimony tended to show that Cabrera was with Saunders and Rowe late in the evening on the night of their deaths, contradicting the State's theory that the Rockford Park Murders happened early in the evening.[273] However, the Supreme Court concluded the State's undisclosed evidence undermined Powell's credibility "by demonstrating that [Powell] was frequently under the influence of drugs" and that Powell "could not remember whether he had been with the victims on the evening of their deaths or on an earlier evening."[274] Therefore, because "[e]vidence tending to undermine the credibility of a witness who testified in favor of the defense is *not favorable to the defense*[,]" the Supreme Court ruled that the undisclosed Powell information did not qualify as

---

[272] *Cabrera Direct Appeal*, 840 A.2d at 1268.
[273] *Id.* at 1270.
[274] *Id.*

*Brady* material.[275]   Because the State was not required to disclose the information, no *Brady* violation had occurred.[276]   In addition, the Supreme Court rejected Cabrera Trial Counsel's claim that "the State lured [Cabrera Trial Counsel] into a trap by providing partial disclosure of what [the State] knew about Powell[,]"[277] and that they were misled or unfairly surprised by the State's evidence impeaching Powell is without merit.[278]

Cabrera's pending postconviction claim alleging a *Brady* violation with respect to Powell is merely a renewal of a formerly adjudicated claim and is therefore subject to procedural bar under Rule 61(i)(4).   Cabrera's Rule 61 motion lacks any new legal or factual information to warrant reconsideration of this issue in the interest of justice.   Therefore, Cabrera's claim is procedurally barred as formerly adjudicated under Rule 61(i)(4) without exception.

Cabrera asserts an accompanying claim of ineffective assistance of counsel on the grounds that Cabrera Trial Counsel was ineffective for failing to adequately investigate Powell *and* in failing to use an investigator to interview him.   Cabrera's claim is inconsistent with the record.   According to Cabrera Trial Counsel's affidavit responding to Cabrera's claims of ineffective counsel:

---

[275] *Id.* (emphasis added).   "[T]he State must disclose impeachment material *only if* it impeaches evidence that is favorable to the State."  *Id.* at 1269.

[276] *Id.* at 1269.

[277] *Id.* at 1268.

[278] *Id.* at 1270 (adding that "[t]he State had disclosed the exculpatory information about Powell and his statements to police.").

> Mr. Powell was a difficult person to track down. We had an address of 1014 W. 7th Street, but we were also given other addresses by neighbors. We reviewed all available Superior Court and Court of Common Pleas documents pertaining to Mr. Powell prior to interviewing him. (None of these documents led us to believe that Mr. Powell was an out-of-control drug addict at the time of his police interview.) We made *repeated efforts* to contact Mr. Powell prior to and during the [Rockford Park T]rial. A number of proposed meetings were either missed or cancelled by Mr. Powell. While our [Defense Investigator] was available to assist us throughout the [Rockford Park T]rial, we discovered a brief window of opportunity to track down and meet with Mr. Powell . . . . We took advantage of that immediate opportunity, and met with him ourselves. On January 22, 2001, Mr. Deckers again spoke with Mr. Powell (beginning at approximately 6:00 p.m.). Mr. Deckers reviewed with Powell the statement that had been provided to us by the State. [Cabrera Trial] Counsel recollect that, on direct examination, Mr. Powell testified fairly consistent with what he had previously told us . . . . Mr. Powell was an unresurrectable phoenix *not because we didn't have [Defense I]nvestigator with us when we spoke to him; rather, we had no way to anticipate the State's tactics and, specifically, the withheld information.*[279]

Cabrera Trial Counsel met reasonable performance standards in connection with their efforts to locate Powell and present his testimony as part of the defense case.

Second, the fact that Cabrera Trial Counsel interviewed Powell without an investigator present is not ineffective assistance of counsel *per se*.[280] Cabrera Trial Counsel's affidavit explains the "immediate" circumstances during which Cabrera Trial Counsel could meet with and interview Powell. Cabrera fails to offer any reason for this Court to conclude that if Defense Investigator had also been

---

[279] Cabrera Trial Counsel Aff. ¶ 9 (emphasis added).
[280] *See ABA Guidelines*, *supra* note 34, § 11.4.1 (providing that defense counsel *should* conduct witness interviews in the presence of a third person).

available under the "immediate" circumstances, then Powell would have offered Cabrera Trial Counsel different information or that it would have changed the outcome.

Third and finally, Cabrera Trial Counsel met with Powell twice and determined that Powell provided "fairly consistent" information. Cabrera Trial Counsel testified at the postconviction evidentiary hearing that, upon interviewing Powell, they believed "Powell would be a good witness. He was working. He had indicated, I believe, that he had *had* a drug problem, but he was not on drugs. He was holding a full-time job, and he appeared to be clean cut[.]"[281]

The Court notes that, upon consideration of Cabrera's claim on direct appeal, the Supreme Court declined to conclude that the State's impeachment evidence regarding Powell surprised Cabrera Trial Counsel.[282] This Court finds that, while Powell was difficult track down, he presented consistent and helpful information. Cabrera cannot satisfy *Strickland*.

### B. Sparkle Harrigan

Harrigan was the girlfriend of Saunders at the time of the Rockford Park Murders. Harrigan provided two statements to the police regarding a timeline of her interactions with Saunders on the night he was killed. According to Cabrera, Harrigan's timeline of the events on the night of the Rockford Park Murders was

---

[281] Ev. Hr'g Tr. 10/23/2012 at 11:16–20 (emphasis added).
[282] *See Cabrera Direct Appeal*, 840 A.2d at 1269–70.

different from the State's timeline at Cabrera's Rockford Park Trial. Cabrera argues that Harrigan's statements were therefore exculpatory and that the State committed a *Brady* violation because it did not disclose the statements to Cabrera Trial Counsel.

Cabrera did not assert this argument on direct appeal and, therefore, the claim is subject to procedural bar under Rule 61(i)(3). Cabrera has not asserted any external impediment that prevented Cabrera Trial Counsel from raising this argument on direct appeal. In addition, the Court notes that Cabrera did not assert an accompanying claim of ineffective assistance of counsel for Cabrera Trial Counsel's failure to assert this claim on direct appeal. Nonetheless, Cabrera's claim fails on the merits because the Harrigan's statements were not exculpatory and, therefore, no *Brady* violation occurred.

Harrigan testified at Reyes' trial regarding the Rockford Park Murders but not at Cabrera's Rockford Park Trial. Harrigan testified consistently with her earlier statements to the police. On direct examination, Harrigan stated that she was with Saunders at his home on the evening of Saturday, January 20, 1996. Harrigan testified that she arrived at Saunders' house around 9:00 p.m. and stayed for about two hours.[283] At some point during her visit, Harrigan testified that Saunders stepped out of the bedroom to talk to [Rowe], who had just allegedly

---

[283] Reyes' Trial Tr. 10/11/2001 at 66:4, 67:3–8, State's App. at B-115–120.

arrived at Saunders' house. Harrigan did not see [Rowe] but recalled that she "could hear voices, but . . . wasn't paying attention to what they were saying."[284]

On cross-examination, Harrigan admitted that she didn't know the exact time she arrived or left Saunders' house. Harrigan admitted that she could have arrived anytime between 8:30 and 9:00 p.m.[285] Harrigan testified that she left Saunders' house because her grandmother paged her to come home and that she received the page sometime after 9:30 but before 10:00 p.m.[286] Harrigan left Saunders' house five to ten minutes after receiving the page.[287]

Cabrera argues that Harrigan stated that she was at Saunders' house from 9:00–11:00 p.m. and that Rowe stopped by at some point during that time and, therefore, her statements discredit the State's timeline of events. This Court does not agree that Harrigan's statements to police, or testimony at Reyes' trial regarding the Rockford Park Murders, discredit the State's timeline of events or qualify as *Brady* material.

According to the record, the State's timeline of events was based on estimates and generalities. For instance, in its closing arguments that State offered vague references to the timeline, such as: "What Donna Ashwell told you is that she is absolutely certain that *on Saturday night, before the Sunday morning* on

[284] *Id.* at 69:9–10.
[285] *Id.* at 81:2–84:1–19.
[286] *Id.* at 86:5–87:1–21.
[287] *Id.* at 89.

which [Saunders] and [Rowe's] bodies were found [Ashwell] overheard coming from the basement the sounds of a terrible beating."[288]  In fact, earlier during the Rockford Park Trial, State Lead Investigating Officer testified that Ashwell made a statement to police that she had heard sounds from the Apartment Building basement at 8:00, 9:00, or *even later* than that.[289]  The State continued its closing argument, "What do we know about what happened on the night of January 20, *early morning hours of January 21.*"[290]  The State's timeline was more general than exacting.  Harrigan's estimated timeline of events did not directly conflict with Ashwell's estimated timeline, nor did Harrigain's statements qualify as exculpatory.

Exculpatory evidence is such that "tends to justify, excuse of clear the defendant from alleged fault or guilty."[291]  Here, Harrigan made statements concerning her estimate of the timing of events on the night of the Rockford Park Murders.  The fact the Harrigan recalled a timeline that overlapped portions of Ashwell's timeline does not go to Cabrera's guilt or innocence.  In addition, Harrigan's statements are not favorable to the defense because the State did not offer a specific time that the Rockford Park Murders occurred.  Accordingly,

---

[288] Closing Arg. Tr. 2/8/2001 at 44:16–20 (emphasis added).
[289] Trial Tr. 2/2/2001 at 5:10–15, 6:9–12.
[290] Closing Arg. Tr. 2/8/2001 at 48:7–8 (emphasis added).
[291] *Black's Law Dictionary* 566 (6th ed. 1990).  *See Wright v. State*, 91 A.3d 972, 977 (Del. 2014) ("A *Brady* violation occurs where the State fails to disclose material evidence that is favorable to the accused, because it is either exculpatory or impeaching, causing prejudice to the defendant.").

Cabrera's claim of a *Brady* violation with respect to the statements of Harrigan has no merit.

## C. Carlos Rodriguez and Omar Colon

Carlos Rodriguez and Omar Colon were arrested in April 2001 for drug charges unrelated to the Rockford Park Murders ("2001 Unrelated Drug Charges"). After his arrest, Rodriguez served as a police informant. Cabrera contends that while the 2001 Unrelated Drug Charges were pending, Rodriguez told the Deputy Attorney General exculpatory *Brady* information about the Rockford Park Murders that the State failed to disclose. Specifically, Cabrera contends that Rodriguez told the Deputy Attorney General that Rodriguez's cousin Colon was responsible for the Rockford Park Murders.

Cabrera did not present this claim on direct appeal but this claim is not subject to a procedural bar under Rule 61(i)(3) because Cabrera Trial Counsel was unaware of the alleged existence of this information until 2012. Accordingly, Cabrera has demonstrated an external impediment that prevented Cabrera Trial Counsel from raising this argument in an earlier proceeding. In addition, this information may qualify as *Brady* material and Cabrera may be able to demonstrate that he was prejudiced without it.

However, upon consideration of the record, this Court cannot conclude that the State ever possessed *Brady* information as alleged by Cabrera. There is no

evidence to corroborate the recollection of the Deputy Attorney General who interviewed Rodriguez in 2001 and the record reflects that the Deputy Attorney General is not even sure if her memory was accurate about the 2001 comment.[292] Moreover, investigating officers were present for the interview and they testified that they did not recall Rodriguez making the comment. Also, Cabrera Rule 61 Counsel deposed Rodriquez in November 2014 and he himself does not remember making such a proffer against Colon.[293] Rodriguez stated that even if he had made a statement regarding Colon's involvement in the Rockford Park murders it was nothing more than a rumor or personal opinion.[294]

Accordingly, this Court finds that the suggested proffer by Colon is illusory, not supported by the record, and therefore not exculpatory.

Cabrera's claims of *Brady* violations concerning Powell, Harrigan, and Rodriguez do not have merit. Cabrera has not demonstrated the existence of a single *Brady* violation. Therefore, Cabrera is not entitled to a new trial on the grounds of the cumulative effect of multiple *Brady* violations.

## XIV. JOINT SENTENCING BY THE TRIAL COURT DID NOT VIOLATE CABRERA'S RIGHT TO INDIVIDUALIZED SENTENCING

A criminal defendant's right to be free from cruel and unusual punishment includes the right to an individualized determination that the defendant should

---

[292] Ev. Hr'g Tr. 4/1/2013 at 77:3–5.
[293] Rodriguez Dep. Tr. 11/14/2012 at 50:20–25, State's App. at B-183–206.
[294] *See id.* at 17–19, 36, 41, 49, 51, 60–61.

receive the death penalty.[295]  Cabrera argues that he did not have the benefit of individualized sentencing because the Trial Court issued a joint sentencing decision addressing Cabrera *and* Reyes.  More importantly, Cabrera objects to consideration by the Trial Court of information presented at Reyes' trial regarding the Rockford Park Murders but not presented at Cabrera's Rockford Park Trial.[296] Cabrera contends that he was prejudiced because he was depicted at Reyes' trial as the more culpable conspirator.[297]  According to Cabrera, he was denied due process because he "had no opportunity to deny or explain" the presentation made at Reyes' trial.[298]

Cabrera did not challenge the Trial Court's joint sentencing decision on direct appeal and, therefore, the claim is subject to procedural considerations under Rule 61(i)(3) which bars relief if the motion includes claims not asserted in prior proceedings leading to the final judgment.  The procedural bars to postconviction

---

[295] U.S. Const. amend. VIII; Del. Const. art. I, § 2; *Zant v. Stephens*, 462 U.S. 862, 879 (1983).

[296] *See e.g., Cabrera Sentencing*, 2002 WL 484641, at *8 ("In Reyes' trial, however, there was some additional evidence.  Most notable were statements which Reyes made."); *id.* at *10 ("[T]here are some significant additional details introduced into evidence in the Reyes trial."); *id.* at *20 ("The motive in Cabrera's trial and hearing was not as fully developed as in Reyes' trial and hearing.").

[297] *See id.* at at *3 ("The malignant influence of [Cabrera] on the life and actions of [Reyes]. During [Reyes] teenage years, [Cabrera] served as a father figure for [Reyes].  [Reyes] felt compelled to participate in criminal acts with [Cabrera] in order to gain his love and respect.").

[298] *See Gardner v. Florida*, 430 U.S. 349, 362 (1977) (finding that the defendant "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.").

relief under Rule 61(i)(3)[299] can be overcome if the motion asserts a colorable claim that there has been a "miscarriage of justice" as the result of a constitutional violation that undermined the fundamental fairness of the proceedings.[300]

There was no miscarriage of justice with respect to issuance of a joint sentencing decision. The Trial Court properly addressed the statutory and non-statutory aggravating factors as to each defendant[301] before discussing the non-statutory aggravating factors as well as the mitigating factors as to Cabrera and Reyes, separately.[302]  Also, the Trial Court properly weighed the aggravating and mitigating circumstances as to each defendant individually.[303]  This Court is satisfied that the Trial Court's joint sentencing decision did not violate Cabrera's constitutional right to individualized sentencing and there was no miscarriage of justice.

Cabrera also asserts a related claim of ineffective assistance of counsel against Cabrera Trial Counsel for the failure to object to the same judge presiding over both Cabrera's and Reyes' trials regarding the Rockford Park Murders. According to Cabrera, had Cabrera Trial Counsel objected, then at least "the evidence from Mr. Reyes'[] trial would not have been considered in sentencing

---

[299] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(1) and (2), but those bars are not relevant here.
[300] Super. Ct. Crim. R. 61(i)(5); *Younger*, 580 A.2d at 555.
[301] *Cabrera Sentencing*, 2002 WL 484641, at *9–13.
[302] *Id.* at *13–19.
[303] *Id.* at *20–22.

110

Mr. Cabrera, and there is a reasonable probability that Mr. Cabrera would have received a different sentence."[304]

Cabrera cannot demonstrate that representation by Cabrera Trial Counsel fell below an objective standard of reasonableness and, therefore, cannot satisfy the *Strickland* requirements for relief. As the Delaware Supreme Court explained in *Jackson v. State*,[305] "[a]s a necessary consequence of their evidentiary gatekeeping function, trial judges hear, see, and make judgments about inadmissible evidence regularly."[306] The *Jackson* Court explained that "review mechanisms exist to protect defendants in cases where the fact finder hearing of inadmissible evidence is so prejudicial as to create an unacceptable 'appearance of impropriety' that could test reasonable lay persons' trust in the judicial system."[307] A single judge presiding at separate trials of co-defendants, even after those trials are severed, does not violate the rights of either defendant. A challenge of the assignment to one judge would not have been consistent with prevailing professional norms.[308]

Accordingly, Cabrera is not entitled to postconviction relief because he had the benefit of individualized sentencing; there was no miscarriage of justice; and

---

[304] Cabrera's Opening Br. 179 (Apr. 14, 2014).
[305] *Jackson v. State* (*Jackson 2011*), 21 A.3d 27 (Del. 2011).
[306] *Id.* at 37–38.
[307] *Id.* at 38.
[308] In fact, in the interest of fairness, it is appropriate for a judge to consider the relative sentences of co-defendants while sentencing. Thus, here the judge should have considered Reyes' sentence during the sentencing of Cabrera even if there were separate penalty hearings. *See State v. Zebroski*, 1997 WL 528287, at *16 (Del. Super. Aug. 1, 1997) *aff'd and remanded*, 715 A.2d 75 (Del. 1998).

Cabrera Trial Counsel's representation did not fall below an objective standard of reasonableness.

## XV. CABRERA IS NOT ENTITLED TO RELIEF ON BASIS OF HIS GENERAL CONSTITUTIONAL OBJECTIONS TO DELAWARE'S DEATH PENALTY STATUTE

Cabrera's Rule 61 motion argues that this Court must vacate his death sentence because the Delaware's 1991 death penalty statute is unconstitutional. In his direct appeal, Cabrera presented these same constitutional objections, and the Delaware Supreme Court rejected these claims. The Delaware Supreme Court, upon Cabrera's direct appeal from his jury conviction following the Rockford Park Trial, specifically addressed Cabrera's claims regarding the constitutionality of Delaware's death penalty. The Supreme Court found no reversible error and no basis to vacate Cabrera's death sentence. The Court specifically rejected Cabrera's argument that Delaware's death penalty statute improperly gave the Trial Court the sole power to sentence Cabrera to death. In addition, the Supreme Court concluded that the Trial Court properly charged the jury during the penalty phase of the Rockford Park Trial.[309]

---

[309] *Cabrera Direct Appeal*, 840 A.2d at 1272–74. The Trial Court told the jury that:

[W]hile the [Trial] Court has the ultimate responsibility for imposing sentence on the defendant, your role as jurors in the sentencing procedure is, nevertheless, both vital and important. You will provide the [Trial] Court, as the conscience of the community, with an advisory opinion on what the jury believes the evidence has shown with regard to the appropriate penalty in this case. Although the [Trial] Court is not bound by your recommendation, your recommended answers to the

Rule 61(i)(4) bars relief if the motion includes grounds for relief formerly adjudicated in any proceeding leading to the judgment of conviction, in an appeal, or in a postconviction proceeding. The procedural bar under Rule 61(i)(4)[310] can be overcome if consideration of the claim on its merits is warranted in the "interest of justice."

The Delaware Supreme Court has consistently upheld the constitutionality of the Delaware Death Statute, including in Cabrera's own case.[311] Under the Delaware capital punishment scheme, the trial judge of the Superior Court bears the ultimate responsibility for imposition of the death sentence.[312] The jury acts in an advisory capacity as the conscience of the community in determining whether

---

questions provided will be given great weight by the [Trial] Court in its final determination of the appropriate sentence.

*Id.* at 1274.

[310] This exception is also applicable to procedural bars to postconviction relief under Rule 61 (i)(2), but that bar is not relevant here.

[311] *See e.g.*, *Swan v. State*, 820 A.2d 342 (Del. 2003) (holding that a jury's conviction of a defendant unanimously and beyond a reasonable doubt for a crime that itself established a statutory aggravating circumstance satisfied the constitutional requirements set forth in *Ring v. Arizona*, 536 U.S. 584 (2002), by providing a determination of the actor that rendered the defendant "death eligible"); *Brice v. State*, 815 A.2d 314 (Del. 2003) (upholding the 2002 version of 11 *Del. C.* § 4209, noting that "[t]he 2002 Statute transformed the jury's role . . . from one that was advisory under the 1991 version . . . into one that is now determinative as to the existence of any statutory aggravating circumstances."); *Ortiz v. State*, 869 A.2d 285, 305 (Del. 2005) (stating that the Delaware Supreme Court "adhere[s] to [its] holding in *Brice* that Delaware's hybrid form of sentencing, allowing the jury to find the defendant death eligible and then allowing a judge to impose the death penalty once the defendant is found to be death eligible, is not contrary to the Sixth Amendment of the United States Constitution[.]"); *Cabrera Direct Appeal*, 840 A.2d at 1272–74.

[312] 11 *Del. C.* § 4209(d); *Brice*, 815 A.2d at 320 (explaining that final sentencing decision rests with the sentencing judge under the 1991 *and* 2002 version of 11 *Del. C.* § 4209).

the death penalty is the appropriate punishment and through its recommendation, plays an integral role in the sentencing result.[313]

These claims are barred pursuant to Rule 61(i)(4) and reconsideration is not warranted in the interest of justice. Cabrera has not presented new legal or factual development to warrant this Court's reconsideration on the merits.[314] To the extent Cabrera alleges the ineffective assistance of counsel for failing to raise any specific issue related to the Delaware Death Statute, Cabrera's claim does not satisfy *Strickland*. Cabrera has not demonstrated that Cabrera Trial Counsel's representation fell below an objective standard of reasonableness because Cabrera Trial Counsel acted reasonably and in accordance with Delaware law.

## XVI. <u>CONCLUSION</u>

Cabrera was entitled to have the extensive mitigating evidence presented to a jury for its consideration in reaching a sentencing recommendation.[315] The Court finds that Cabrera Trial Counsel provided ineffective assistance of counsel with respect to the mitigation investigation, the lack of preparation for the penalty phase, and the inaccurate presentation of Cabrera's childhood and upbringing. Under *Strickland*, the appropriate remedy is for the Court to vacate Cabrera's death

---

[313] *Jackson v. State*, 684 A.2d 745, 749 (Del. 1996). *See also Witherspoon*, 391 U.S. at 519–20.
[314] After briefing was completed, Cabrera Rule 61 Counsel moved to stay the postconviction proceedings on the grounds that the United States Supreme Court granted *certiorari* in *Florida v. Hurst*, 135 S. Ct. 1531 (Mar. 9, 2015). This Court denied the motion to stay after oral argument.
[315] *See* 11 *Del. C.* § 4209.

sentence. The fundamental legality, reliability, integrity and fairness of the proceedings leading to Cabrera's convictions and sentencing are otherwise sound.

**NOW, THEREFORE, this 17th day of JUNE, 2015, the Postconviction Motion of Luis G. Cabrera, Jr. is GRANTED in part and DENIED in part. The death sentence imposed by Order dated March 14, 2002 is hereby VACATED. This Court finds that the fundamental legality, reliability, integrity and fairness of the proceedings leading to Cabrera's convictions and sentencing are otherwise sound and do not merit relief.**

**IT IS SO ORDERED.**

*Andrea L. Rocanelli*

_____

**The Honorable Andrea L. Rocanelli**

115